# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 11-2353

ERNO KALMAN ABELESZ *et al.,*[*]

*Plaintiffs-Appellees,*

*v.*

OTP BANK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-01884—**Samuel Der-Yeghiayan**, *Judge.*

No. 11-2386

ERNO KALMAN ABELESZ *et al.,*

*Plaintiffs-Appellees,*

*v.*

MKB BANK ZRT., sued as
MKB BAYERISCHE LANDESBANK,

*Defendant-Appellant.*

[*] These appeals had been captioned "*Holocaust Victims of Bank Theft v. OTP Bank*" and "*Holocaust Victims of Bank Theft v. MKB Bank Zrt.*" We have reformed the captions to name the first named plaintiff. Federal Rule of Civil Procedure 10(a) requires pleadings to name parties, not to presume the merits of the plaintiffs' claims, no matter how compelling they may be.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-01884—**Samuel Der-Yeghiayan**, *Judge.*

———————

No. 11-2875

ERNO KALMAN ABELESZ *et al.*,

*Plaintiffs-Appellees,*

*v.*

MKB BANK ZRT., sued as
MKB BAYERISCHE LANDESBANK,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-01884—**Samuel Der-Yeghiayan**, *Judge.*

———————

No. 11-3247
IN RE:

     MKB BANK ZRT., sued as
     MKB BAYERISCHE LANDESBANK,

*Petitioner.*

———————

Petition for Writ of Mandamus to
the Northern District of Illinois, Eastern Division.
No. 1:10-cv-01884—**Samuel Der-Yeghiayan**, *Judge.*

———————

No. 11-3249
IN RE:
    OTP BANK,

*Petitioner.*

---

Petition for Writ of Mandamus to
the Northern District of Illinois, Eastern Division.
No. 1:10-cv-01884—**Samuel Der-Yeghiayan**, *Judge.*

---

ARGUED JANUARY 11, 2012—DECIDED AUGUST 22, 2012

---

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.*    A group of Holocaust survivors and heirs of other Holocaust victims filed suit against several banks alleging that the banks participated in expropriating property from Hungarian Jews during the Holocaust. This case and a parallel case against the Hungarian national railway have produced nine separate pending appeals and mandamus petitions. In this opinion, we address the plaintiffs' claims against two privately owned Hungarian banks, defendants MKB Bank Zrt. ("MKB") and OTP Bank ("OTP"). In separate opinions released today, we address plaintiffs' claims against another private bank, the Hungarian national bank, and the Hungarian

national railway.[1]

Plaintiffs' complaint describes a part of the tragic, historic crimes that were the Holocaust, focusing on the role of Hungarian banks in expropriating money from Jews and financing part of the Holocaust. Since defendants seek review of denials of their motions to dismiss, our account of the facts treats all factual allegations in the complaint as true. As post-World War I treaties took their economic toll on Hungary, the non-Jewish population became increasingly hostile toward Hungarian Jews who, as a group, enjoyed relatively great economic influence. The widespread murders of the Holocaust came relatively late to Hungary, in April 1944, but long before then, Hungarian Jews were subjected to a series of anti-Semitic decrees that sought to limit Jewish economic influence and property ownership. Jews were ordered to turn over their personal property and valuables to officials who collected the property and gave receipts to the owners — ostensibly so the owners could reclaim the property at a future date. A special account was created to centralize and coordinate the funds from frozen and looted Jewish bank accounts. "Aladar" ("straw men") were designated by the government to administer Jewish property.

Plaintiffs allege that Hungarian banks, including defendants MKB and OTP, played critical roles in the ex-

---

[1]  See *Abelesz v. Erste Group Bank AG*, ___ F.3d ___ (7th Cir. 2012); *Abelesz v. Magyar Nemzeti Bank*, ___ F.3d ___ (7th Cir. 2012).

propriation scheme, which was essential to finance the genocide of the Holocaust in Hungary. The scheme relied on Hungarian banks to freeze the assets of their Jewish customers, preventing them from withdrawing funds to finance escape from the ever-increasing Hungarian repression. Plaintiffs allege that expropriation of Jews' wealth was also a critical component of the genocide, both to fund the government's murderous activities and to impoverish survivors so that it would be impossible for them to return to their homes in Hungary. Beginning in April 1944, Hungarian Jews were deported to Auschwitz and other death camps. After the end of World War II, some Jewish survivors or heirs of murdered victims attempted to return to their family homes and to retrieve valuables in safe deposit boxes. Those who were able to return found empty safe deposit boxes and homes occupied by strangers.

Invoking subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330(a), the Alien Tort Statute, 28 U.S.C. § 1350, and federal question jurisdiction, 28 U.S.C. § 1331, plaintiffs allege six causes of action: genocide, aiding and abetting genocide, bailment, conversion, constructive trust, and accounting. Plaintiffs seek to have their case certified as a class action and ask that each defendant bank be held jointly and severally responsible for damages of approximately $75 billion. The defendant banks moved to dismiss on many grounds, including lack of subject-matter jurisdiction and lack of personal jurisdiction. The district court denied all motions to dismiss, motions to reconsider, and motions for certification of inter-

locutory appeal under 28 U.S.C. § 1292(b). *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 807 F. Supp. 2d 689 (N.D. Ill. 2011) (denying motions to dismiss); 807 F. Supp. 2d 699 (N.D. Ill. 2011) (denying motions for reconsideration, clarification, and certification of interlocutory appeal).

Those denials pose some challenging problems of appellate jurisdiction, as we explain below. The appellate jurisdiction story in this case begins with defendant Magyar Nemzeti Bank ("MNB"), the Hungarian national bank, which moved to dismiss based on a defense of sovereign immunity under the FSIA, 28 U.S.C. § 1604. The district court denied MNB's motion. MNB has appealed the district court's denial of its motion to dismiss on sovereign immunity. As we explain in *Abelesz v. Magyar Nemzeti Bank*, it is well established that an order denying sovereign immunity under the FSIA is a collateral order subject to interlocutory appeal. ___ F.3d at ___. From that one sound basis for appellate jurisdiction, MNB has asked us to exercise pendent appellate jurisdiction over the other arguments it made for dismissal. And, in turn, appellants MKB and OTP, like Erste Group Bank, seek here to stretch the narrow doctrine of pendent appellate jurisdiction to include their appeals and the separate issues they seek to raise. MKB and OTP, like Erste, also filed petitions for writs of mandamus, which they ask us to consider in the event that appellate jurisdiction is lacking.

We dismiss MKB's and OTP's appeals for lack of appellate jurisdiction. Their petitions for writs of mandamus

are granted, however, based on an unusual combination of the extraordinary nature of this litigation and the complete absence of any arguable basis for exercising general personal jurisdiction over MKB and OTP in a U.S. court.

The losses alleged by plaintiffs were part of the crimes of the Holocaust in central Europe in the 1940s. This case demonstrates some of the limits in trying to use civil courts on another continent to obtain legal relief for those crimes, now more than 60 years old. Our order that the claims against MKB and OTP be dismissed is not based on a determination that the conduct alleged here was beyond the reach of the law. When faced with similar claims, Judge Kram wrote eloquently:

> It goes without saying that the events which form the backdrop of this case make up one of the darkest periods of man's modern history. Those persecuted by the Nazis were the victims of unspeakable acts of inhumanity. At the same time, however, it must be understood that the law is a tool of limited capacity. Not every wrong, even the worst, is cognizable as a legal claim.

*In re Austrian & German Bank Holocaust Litigation*, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000), *aff'd on other grounds sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001). We agree. We are a court of law that must itself comply with the law. We must confront a basic jurisdictional question — whether plaintiffs are entitled to require these defendants to defend themselves in a U.S. federal court. The district court lacks the constitu-

tional power to exercise personal jurisdiction over these defendants, so the answer to that question is no. We order the district court to dismiss the claims against MKB and OTP for lack of personal jurisdiction.[2]

## I. *Appellate Jurisdiction*

At the outset, we must consider our own jurisdiction over these appeals. MKB and OTP seek review of the district court's denial of their motions to dismiss. As a general rule, the district court must issue a final order before an appellate court has jurisdiction to entertain an appeal. See 28 U.S.C. § 1291. MKB and OTP both argue that this court has pendent appellate jurisdiction

---

[2] Because we lack appellate jurisdiction and grant mandamus for both MKB and OTP based on the district court's clear lack of personal jurisdiction, we do not address a number of other arguments made by MKB and OTP, including the act of state doctrine, the political question doctrine, treaty-based arguments, statutes of limitations, and subject-matter jurisdiction. We note for completeness, however, that the Supreme Court is currently considering two aspects of the scope of the Alien Tort Statute that may be relevant to plaintiffs' claims here: (1) whether corporations are subject to tort liability for violations of the law of nations, and (2) whether and under what circumstances the ATS allows U.S. courts to hear claims for violations of the law of nations occurring within the territory of a sovereign other than the United States. See *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111 (2d Cir. 2010), *cert. granted*, 80 U.S.L.W. 3237 (U.S. Oct. 17, 2011) (No. 10-1491), *calendared for reargument*, 80 U.S.L.W. 3506 (Mar. 5, 2012).

over their appeals on the theory that the issues they present are "inextricably intertwined" with MNB's appeal of the district court's denial of foreign sovereign immunity. MKB further argues that the "adverse foreign policy consequences" of maintaining the suit against it render the district court's refusal to dismiss the case a collateral order subject to immediate appeal. Neither argument provides us with jurisdiction over MKB's and OTP's appeals.

A. *Pendent Appellate Jurisdiction*

As noted, defendant MNB, the Hungarian national bank, has appealed the district court's denial of its sovereign immunity defense under the FSIA. In its own appeal, MNB raises other issues that it argues are pendent to the FSIA immunity defense. We clearly have jurisdiction over MNB's appeal of the denial of sovereign immunity and address the merits of that defense in a separate opinion in *Abelesz v. Magyar Nemzeti Bank*. ___ F.3d ___. From this one solid foothold on appellate jurisdiction, MKB and OTP argue that this court should exercise pendent appellate jurisdiction over their appeals because they are "inextricably intertwined" with MNB's appeal. We disagree.

Pendent appellate jurisdiction is a narrow doctrine that allows an appellate court "to review an otherwise unappealable interlocutory order if it is 'inextricably intertwined with an appealable one.' " *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010), quoting *Montano v. City of Chicago*, 375 F.3d

593, 599 (7th Cir. 2004). The Supreme Court sharply restricted the use of pendent appellate jurisdiction in *Swint v. Chambers County Comm'n*, 514 U.S. 35, 43-51 (1995), but left a narrow path that the Court later followed in *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1997), where an appealable collateral order denying presidential immunity was "inextricably intertwined" with an order staying discovery and postponing trial. This "vestige of the doctrine survives," though we have said that pendent appellate jurisdiction "has not flourished" since *Swint*. *Caldwell-Baker Co. v. Parsons*, 392 F.3d 886, 887 (7th Cir. 2004); see also *McCarter v. Retirement Plan for Dist. Managers of American Family Ins. Grp.*, 540 F.3d 649, 653 (7th Cir. 2008) ("[E]ven when circumstances are exceptional the availability of pendent appellate jurisdiction is doubtful."). At best, pendent appellate jurisdiction may be invoked only if there are "compelling reasons" for not deferring the appeal of the otherwise unappealable interlocutory order to the end of the lawsuit. *People of State of Ill. ex rel. Hartigan v. Peters*, 861 F.2d 164, 166 (7th Cir. 1988); see also *McCarter*, 540 F.3d at 653 ("only the most extraordinary circumstances could justify the use of whatever power the courts of appeals possess" to exercise pendent jurisdiction).

This room for the "inextricably intertwined" use of pendent appellate jurisdiction should not be stretched to appeal normally unappealable interlocutory orders that happen to be related — even closely related — to the appealable order. *Hartigan*, 861 F.2d at 166; see also *U.S. for Use of Valders Stone & Marble, Inc. v. C-Way Const. Co.*, 909 F.2d 259, 262 (7th Cir. 1990) ("A close relationship

between the unappealable order and the appealable order will not suffice: it must be practically indispensable that we address the merits of the unappealable order in order to resolve the properly-taken appeal."). This is because resolving appeals from non-final decisions is generally incompatible with the final-judgment rule embodied in 28 U.S.C. § 1291. *McCarter*, 540 F.2d at 653.

Given the narrow scope of the doctrine, neither MKB nor OTP makes a compelling case for exercising pendent appellate jurisdiction. As we decide in *Abelesz v. Magyar Nemzeti Bank*, we have appellate jurisdiction over MNB's appeal of the district court's denial of sovereign immunity, but we decline to exercise pendent appellate jurisdiction over the other issues that MNB itself seeks to raise. ___ F.3d at ___. MKB's and OTP's appeals are further attenuated, arguing that some issues they raise on appeal are pendent directly to MNB's sovereign immunity defense and some issues are pendent to MNB's other issues over which we do not have jurisdiction.[3] From the one solid foothold on

---

[3] To support pendent party appellate jurisdiction, defendants cite our decision in *Greenwell v. Aztar Indiana Gaming Corp.*, 268 F.3d 486, 491 (7th Cir. 2001), where we exercised pendent jurisdiction over a malpractice claim "entwined" with an indemnity claim properly before the court because doing so "served [the] broader purposes of efficiency and consistent resolution of the case." *Jones v. InfoCure Corp.*, 310 F.3d 529, 536 (7th Cir. 2002). As plaintiffs point out, however, we have since noted that in *Swint*, the Supreme Court rejected "judicial

(continued...)

appellate jurisdiction — denial of sovereign immunity for MNB — these other defendants ask this court to review nearly every issue they raised in the district court, and to do so after the litigation has progressed no further than the denial of their respective motions to dismiss. The pendent party appellate jurisdiction that MKB and OTP rely upon has not survived *Swint*. See 514 U.S. at 51.

The varied issues raised by the defendants do not concern "the same single issue." *Research Automation, Inc.*, 626 F.3d at 977 ("Both the denial of the injunction and the district court's transfer order concern the same single issue: whether this case should be litigated in Illinois or in Virginia."). Nor are they "the head and tail of the same coin." *Hartigan*, 861 F.2d at 166. While the issues that MKB and OTP seek to argue are no doubt closely related to the issues that MNB appeals, they are not so "inextricably intertwined" with MNB's sovereign immunity defense as to make it "practically indispensable" that we address their merits now. See *Swint*, 514 U.S. at 51; *Valders Stone & Marble*, 909 F.2d at 262. Exercising pendent appellate jurisdiction over MKB's and OTP's appeals would not be consistent with the statutes and case law establishing the final-judgment rule.

---

[3] (...continued)
economy" as an appropriate basis for pendent appellate jurisdiction. *McCarter*, 540 F.2d at 653.

B. *Collateral Order Doctrine*

MKB also argues that the "adverse foreign policy conse-quences" of maintaining the suit against it render the district court's refusal to dismiss the case an im-mediately appealable collateral order. MKB claims that, without this appeal, there are no further steps it can take to preserve the relevant interest at stake, which it identifies as "that there not be legal proceedings that undercut U.S. foreign relations."

This argument is based on the U.S. government's efforts to "provide some measure of justice to the victims of the Holocaust, and to do so in their remaining lifetimes." U.S. Statement of Interest, Stipulated J.A. 49. The United States has been party to two international settlements that have provided approximately $8 billion for the benefit of victims of the Holocaust. One of these settle-ments, the German Foundation, was capitalized by the Federal Republic of Germany and German companies and was "to be the exclusive remedy and forum for the resolution of, all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." *Id.* at 50. To facilitate the creation and funding of the German Founda-tion, the United States pledged to help achieve "legal peace" for German companies with respect to Nazi-era claims in U.S. courts.[4] The United States, based on its

---

[4] While MKB is a Hungarian bank, the United States has determined that it qualifies as a "Germany company" within the

(continued...)

participation in the German Foundation, submitted a Statement of Interest pursuant to 28 U.S.C. § 517 urging dismissal of the claims against MKB "on any valid legal ground(s)" but did not argue for any specific theory for dismissal. Stipulated J.A. 48.

This court has jurisdiction to hear appeals from all final decisions of the district court, except where direct review by the Supreme Court is available. 28 U.S.C. § 1291. The Supreme Court has given the final-judgment rule of § 1291 a practical construction by permitting appeals from "a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" *Swint*, 514 U.S. at 41-42. An immediately appealable collateral order is one that (1) conclusively determines the disputed question; (2) resolves important issues separate from the merits; and (3) is effectively unreviewable on appeal from a final judgment. *Mohawk Industries, Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009).

MKB argues that the requirements of the collateral order doctrine are met in this case. The district court's denial of its motion to dismiss on political question grounds "conclusively determines that the lawsuit will proceed to the detriment of U.S. foreign relations." Second, U.S. foreign policy interests are a consideration separate

---

[4] (...continued)
German Foundation's definition of that term. During World War II and now, MKB has been more than 25% owned by a German parent company, Bayerische Landesbank. Stipulated J.A. 63.

from the merits of the suit, and vindication of that interest, argues MKB, benefits the United States and Germany, not MKB.[5] Third, MKB argues that the foreign policy interest at stake cannot be protected through an appeal from final judgment because the "legal peace" offered by the German Foundation would be rendered hollow. Thus, MKB contends, where the district court denies a motion to dismiss after the U.S. government has submitted a Statement of Interest seeking dismissal of the suit to advance the United States' foreign policy interests, immediate appeal should be available under the collateral order doctrine.

The collateral order doctrine is a narrow exception that must remain narrow so that it does not supercede the general rule "that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); see also *Will v. Hallock*, 546 U.S. 345, 350 (2006) ("we have not mentioned applying the collateral order doctrine recently without emphasizing its modest scope"). The doctrine's modest scope reflects a "healthy respect" for the virtues of the final-judgment rule. *Mohawk Industries, Inc.*, 130 S. Ct. at 605. "Permitting piecemeal, prejudgment appeals . . . undermines

---

[5]  We do not credit MKB's claim that "vindication of that interest [in avoiding interference with U.S. foreign policy] will benefit the United States and Germany, not MKB." Obviously, dismissal of the suit against MKB would greatly benefit MKB, separate and apart from any potential benefit to the foreign policy interests of the United States or Germany.

'efficient judicial administration' and encroaches upon the prerogatives of district court judges, who play a 'special role' in managing ongoing litigation." *Id.*, quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981). Thus, the justification for immediate appeal must be sufficiently strong to outweigh the usual benefits of deferring appeal until the conclusion of the litigation. *Id.*

The justification for immediate appeal, moreover, must be based on the entire category of similar cases rather than the potential benefits in the particular case. "As long as the class of claims, taken as a whole, can be adequately vindicated by other means, the chance that the litigation at hand might be speeded, or a particular injustice averted, does not provide a basis for jurisdiction under § 1291." *Id.* (internal quotations omitted). The Supreme Court has applied the collateral order rule categorically, treating different sorts of defenses or issues as either covered or not covered. For example, orders denying various types of immunity may be immediately appealed under the collateral order doctrine. *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 789 (7th Cir. 2011) (FSIA sovereign immunity), citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (qualified immunity), and *Nixon v. Fitzgerald*, 457 U.S. 731, 742-43 (1982) (absolute presidential immunity). On the other hand, denial of a motion to dismiss for lack of personal jurisdiction or *forum non conveniens* is not appealable as a collateral order. *Van Cauwenberghe v. Biard*, 486 U.S. 517, 526-28 (1988) (affirming dismissal of appeal from denial of motion to dismiss based on claimed immunity from civil process); *Catlin v. United States*, 324 U.S. 229, 236

(1945) ("denial of a motion to dismiss, even when the motion is based upon jurisdictional grounds, is not immediately reviewable"); *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1024-25 (9th Cir. 2010) (en banc) (holding that court had jurisdiction over denial of immunity under FSIA but not denial of motion to dismiss for lack of personal jurisdiction); *Rux v. Republic of Sudan*, 461 F.3d 461, 474-76 (4th Cir. 2006) (same). Nor is a sanctions order for discovery violations under Rule 37(a) of the Federal Rules of Civil Procedure, *Cunningham v. Hamilton County*, 527 U.S. 198, 205 (1999), or a disclosure order rejecting a claim of attorney-client privilege, *Mohawk Industries, Inc.*, 130 S. Ct. at 606-07. The line between those orders that are and are not appealable as collateral orders probably owes more to history than to precise logical consistency, but the line has been drawn in precedents that we must respect and follow as best we can.

In applying these teachings, the D.C. Circuit has determined that the denial of a motion to dismiss on political question grounds is not immediately appealable as a collateral order, *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 349 (D.C. Cir. 2007), although the first two requirements of the collateral order doctrine were satisfied. The D.C. Circuit took to heart the Supreme Court's admonition that "we have meant what we have said; although the Court has been asked many times to expand the 'small class' of collaterally appealable orders, we have instead kept it narrow and selective in its membership." *Will*, 546 U.S. at 350, quoted in *Doe*, 473 F.3d at 349. MKB has not directed us to, and we have not found, any case in

which a federal appeals court held that denial of a motion to dismiss on political question grounds was immediately appealable as a collateral order. Permitting an appeal from the denial of a motion to dismiss based on political question grounds would substantially expand the scope of the collateral order doctrine. We follow the D.C. Circuit in *Doe* on this question, 473 F.3d at 353, and hold that the collateral order doctrine does not provide appellate jurisdiction over MKB's political question defense.[6]

II.  *Mandamus Jurisdiction*

So we do not have appellate jurisdiction over the issues that MKB and OTP seek to raise in Nos. 11-2353, 11-2386, and 11-2875, and those appeals must be dismissed. After plaintiffs challenged appellate jurisdiction,

---

[6] Our determination that we lack appellate jurisdiction is not based on the fact that MKB might have another chance to present its political question argument in a summary judgment motion or at trial, as urged by plaintiffs. That argument by plaintiffs misunderstands the collateral order doctrine. For example, a defendant whose motion to dismiss a claim under 42 U.S.C. § 1983 on grounds of qualified immunity is denied often can appeal under the collateral order doctrine even though the same issue could be raised again later in the district court. We hold only that a denial of a motion to dismiss on political question grounds is not among the "small class " of orders that are collaterally appealable. See *Will*, 546 U.S. at 350 (holding that refusal to apply Federal Tort Claims Act's judgment bar was not appealable as collateral order).

MKB and OTP also filed petitions for writs of mandamus to compel the district court to dismiss the claims against them. As a general rule, appellate courts are not in the business of reviewing routine denials of motions to dismiss — not by using pendent appellate jurisdiction, not by using the collateral order doctrine, and certainly not by issuing a writ of mandamus. The final-judgment rule exists to reduce piecemeal litigation and encroachment on the special role district judges play in managing litigation. See *Mohawk Industries, Inc.*, 130 S. Ct. at 605. Furthermore, until a case is over, litigants do not know whether an individual claim of error actually matters, and appellate courts usually benefit from having an entire record in front of them.

The extraordinary nature of this litigation, however, makes the district court's denial of MKB's and OTP's motions to dismiss for lack of personal jurisdiction anything but routine. Plaintiffs seek compensation for events that occurred on another continent more than 65 years ago. The case has appreciable foreign policy consequences, and the financial stakes are astronomical. Plaintiffs seek to impose joint and several liability on each defendant bank for $75 billion in damages — an amount that is nearly 40 percent of Hungary's annual gross domestic product. The consequences for the plaintiffs themselves are also very substantial. If the claims against these defendants do not belong in U.S. courts, no matter how compelling the claims might be on the merits, we would do the plaintiffs no favors by allowing them to spend more time and money to proceed further toward an inevitable dismissal. It is

the confluence of these specific factors, together with the crystal clarity of the personal jurisdiction issue, that removes this case from the category of "ordinary" denials of motions to dismiss. See *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 381 (2004) (court of appeals erred in finding it lacked authority to issue writ of mandamus to provide immediate review of district court discovery order that could affect the privacy of President's policymaking processes; executive privacy concerns removed district court order from the category of "ordinary" discovery orders). Plaintiffs' claims do not arise out of any business contacts these defendants have with the United States, so specific personal jurisdiction does not apply here. Plaintiffs assert instead that U.S. courts have general personal jurisdiction over these Hungarian banks. General jurisdiction over a defendant, which means that the defendant can be required to answer any claim that arose anywhere in the world, requires that the defendant be "essentially at home" in the forum. See *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). The allegations against MKB and OTP do not come close to meeting that standard, and neither the plaintiffs nor the district court have offered even a colorable argument for satisfying that standard.

This court is authorized to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a). Mandamus is a "drastic remedy traditionally used to confine a lower court to the lawful exercise of its jurisdiction or to compel it to exercise its authority when it has a duty to do so." *United States v. Lapi*, 458 F.3d 555, 560-61

(7th Cir. 2006); see also *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34-35 (1980) (per curiam) ("Only exceptional circumstances, amounting to a judicial usurpation of power, will justify the invocation of this extraordinary remedy."). Three conditions must be satisfied for a writ to issue. First, the party seeking the writ must demonstrate that the challenged order is not effectively reviewable at the end of the case, that is, without the writ the party will suffer irreparable harm. Second, the party seeking the writ must demonstrate a clear right to the writ. Last, the issuing court must be satisfied that issuing the writ is otherwise appropriate. See *Cheney*, 542 U.S. at 380-81; *In re Sandahl*, 980 F.2d 1118, 1119 (7th Cir. 1992) ("[T]he petitioner must show *irreparable* harm (or, what amounts to the same thing, the lack of an adequate remedy by way of direct appeal or otherwise) and a *clear* right to the relief sought."). The Supreme Court has said that "[t]hese hurdles, however demanding, are not insuperable." *Cheney*, 542 U.S. at 381 (granting writ). We conclude that this exacting standard is satisfied here with respect to the district court's denial of MKB's and OTP's motions to dismiss for lack of personal jurisdiction.[7]

---

[7]  Because writs of mandamus should issue on the basis of the district court's clear lack of general jurisdiction over these defendants, we do not reach the merits of MKB's alternative argument that a writ should issue based on its political question argument.

A. *Irreparable Harm*

Defendants argue that they have no other adequate means to obtain the desired relief — full dismissal of the suits against them. The district court denied MKB's and OTP's motions to dismiss on personal jurisdiction grounds. 807 F. Supp. 2d at 695. MKB and OTP then filed motions for reconsideration, for clarification, and for certification of an interlocutory appeal. Without meaningful explanation or engagement, the court denied these motions as well, rejecting binding Supreme Court authorities as "not on point as far as personal jurisdiction is concerned in this case." 807 F. Supp. 2d at 704. The defendants thus face the prospect of protracted litigation of events that occurred 65 years ago on another continent, and joint and several liability of $75 billion, which may place intense pressure on the defendants to settle. See, *e.g.*, *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1297-98 (7th Cir. 1995). Settlement would mean that the district court order creating the pressure to settle, the denial of MKB's and OTP's motions to dismiss on personal jurisdiction grounds, may never be reviewed. By itself, of course, such pressure is not enough to justify an encroachment on the final-judgment rule by use of mandamus. Our judicial system entrusts great power to U.S. district judges, and appellate review of their decisions must follow a complex set of legal rules and procedures. But the extraordinary nature of this litigation cannot be ignored as a factor in the overall decision.

Plaintiffs argue that potential class action liability should not figure into the "irreparable harm" analysis

because a future order certifying a plaintiff class could be the subject of an interlocutory appeal under Federal Rule of Civil Procedure 23(f). The prospect that defendants might be able to appeal a future class certification does not provide an adequate alternative means to have the district court's extraordinary decision on personal jurisdiction reviewed by a writ of mandamus. See, *e.g.*, *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 671-72 (9th Cir. 2004) (in appeal of certification of class action, refusing to exercise pendent appellate jurisdiction over challenge to district court's exercise of personal jurisdiction); *id.* at 672 ("[T]he district court's personal jurisdiction and class certification decision are only tangentially related, such that we lack jurisdiction to evaluate the district court's personal jurisdiction decision in the context of this Rule 23(f) appeal."); cf. *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 492-93 (7th Cir. 2012) (exercising pendent appellate jurisdiction to review class-certification and liability decisions in tandem with order imposing remedial scheme only because review was "practically indispensable" to resolve proper appeal). As we have recognized before, the sheer magnitude of risk defendants are exposed to in a class action can provide intense pressure to settle. *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d at 1297-98. MKB and OTP have established that the district court's refusal to dismiss them from the case on personal jurisdiction grounds is not effectively reviewable at the end of the case.

B. *Clear Right*

As we explain in detail in Part III of this opinion, MKB's and OTP's contacts with the United States simply do not come close to meeting the "essentially at home" standard needed to exercise general jurisdiction over a foreign defendant. The defendants gave the district court every opportunity to address the controlling authorities and legal standard, but the district court simply refused to engage with relevant case law. It failed to appreciate the stringent "essentially at home" standard that applies to exercises of general jurisdiction. If there were a colorable argument supporting the district court's exercise of jurisdiction, we would view this case differently. The overwhelming clarity of this issue, however, calls for use of the extraordinary writ of mandamus to confine the district court to the proper exercise of its jurisdiction. See *Sandahl*, 980 F.2d at 1120-21 (granting writ where petitioner showed that order disqualifying law firm was "patently erroneous").

C. *"Otherwise Appropriate"*

OTP argues that issuance of a writ is appropriate in this case because it raises serious questions about the reach of a U.S. court's personal jurisdiction over a foreign entity. Plaintiffs counter that " 'Serious questions' do not rise to the level of 'really extraordinary,' simply because Petitioners [MKB and OTP] do not like the district court's reasoned answers to those questions." MKB and OTP are large foreign banks with the types of contacts with the United States that one would expect

any large foreign bank to have. Under the district court's reasoning, virtually any large bank located anywhere in the world could be sued in any U.S. court on any claim arising anywhere in the world. That would be an extraordinary and unwarranted expansion of the U.S. courts' general jurisdiction that would raise serious international law questions about the reach of U.S. law. See *In re Hijazi*, 589 F.3d 401, 411 (7th Cir. 2009) (granting writ and ordering district court to rule on foreign defendant's motion to dismiss indictment even though he was a fugitive, particularly where case raised "delicate foreign relations issues"). Issuance of a writ in this case does what the writ was intended to do — confine the district court to a lawful exercise of its pre-scribed jurisdiction. See *Cheney*, 542 U.S. at 380. The issuance of a writ is appropriate under these extra-ordinary circumstances.

## III. *Personal Jurisdiction*

The claims underlying this case are that defendants MKB and OTP, two foreign banks, participated in the wholesale plunder of the assets of Jews in Hungary during the Holocaust, more than 65 years ago. As powerful and troubling as those allegations are, the United States constitutional guarantee of due process of law requires that defendants not present in the forum have "certain minimum contacts" with the forum such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial jus-tice.'" *International Shoe Co. v. Washington*, 326 U.S. 310,

316 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940). The basic inquiry is whether the defendant's contacts with the forum are such that it should reasonably anticipate being haled into court there. *International Medical Group, Inc. v. American Arbitration Ass'n*, 312 F.3d 833, 846 (7th Cir. 2002), citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), and *Central States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). MKB and OTP have the type of business contacts that many large foreign banks have with the United States. Those contacts are not the type of "continuous and systematic" contacts that would render MKB and OTP "essentially at home" in the United States, see *Goodyear Dunlop Tires Operations, S.A.*, 131 S. Ct. at 2851, such that they should reasonably anticipate being haled into a U.S. court to answer for events, no matter how heinous, that occurred half a world away.

A. *Requirements for General Personal Jurisdiction*

In the realm of personal jurisdiction, federal constitutional law draws a sharp and vital distinction between two types of personal jurisdiction: specific or case-linked jurisdiction, and general or all-purpose jurisdiction. *Goodyear Dunlop Tires Operations, S.A.*, 131 S. Ct. at 2851. Specific jurisdiction is jurisdiction over a specific claim based on the defendant's contacts with the forum that gave rise to or are closely connected to the claim itself. *Id.* General jurisdiction, in contrast, does not depend on any connection between the underlying claim and

the forum. "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home* in the forum State." *Id.* (emphasis added). This is a demanding standard, for the consequences for the defendant can be severe.

Where a court has general jurisdiction over a defendant, that defendant may be called into that court "to answer for any alleged wrong, committed in any place, no matter how unrelated to the defendant's contacts with the forum." *uBid, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010). The constitutional requirement for general jurisdiction therefore is "considerably more stringent" than that required for specific jurisdiction. *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003), quoting *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001). Courts look for "continuous and systematic general business contacts," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984), and inquire whether the business was "sufficiently substantial and of such a nature" as to permit the exercise of personal jurisdiction, *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 447 (1952).

A corporation is "essentially at home" both where it is incorporated and where its principal place of business is located. *Goodyear*, 131 S. Ct. at 2853-54. Beyond those easy cases, the best example of the "essentially at home" standard is found in *Perkins*, where the president and

general manager of a Philippine mining corporation returned to his home in Ohio during the Japanese occupation of the Philippine Islands during World War II. While in Ohio, he maintained an office from which he conducted activities for the company. He kept company files and held directors' meetings in the office, carried on correspondence related to the business, distributed salary checks drawn on two active Ohio bank accounts, engaged an Ohio bank to act as a transfer agent, and supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines. 342 U.S. at 447-49. Based on these contacts, the Supreme Court determined: "The corporation had been carrying on in Ohio a continuous and systematic, but limited, part of its general business." *Id.* at 438.

The "continuous and systematic" activity of the relocated company headquarters in *Perkins* stands in sharp contrast to the limited activity at issue in *Helicopteros Nacionales de Colombia, S.A.* Survivors of a U.S. citizen who died in a helicopter crash in Peru brought a wrongful-death action in a Texas state court against the Colombian corporation that owned and operated the helicopter. The Court noted that the Colombian corporation, Helicol, did not have a place of business in Texas and had never been licensed to do business in the state. Helicol's CEO had gone to Houston for a meeting to negotiate the contract for transportation services with the plaintiffs' employers. Helicol also deposited checks drawn on a Houston bank, made significant purchases from Bell Helicopter in Texas, and sent

its personnel to Texas for training at Bell's facilities there. The Supreme Court held that Helicol's contacts with Texas were insufficient to satisfy due process requirements for general personal jurisdiction. The Court discounted the lone business trip as not "continuous and systematic," noted that "[c]ommon sense and everyday experience" suggest that the bank on which a check is drawn is generally left to the discretion of the drawer, and held that even regular purchases were not enough to support an exercise of general jurisdiction. 466 U.S. at 417-18.

More recently, the Supreme Court addressed the standard for general jurisdiction in *Goodyear Dunlop Tires Operations, S.A.* In *Goodyear*, two North Carolina teenagers died in a bus accident in France. Attributing the accident to a failed tire, the teenagers' parents filed a wrongful death suit in North Carolina against Goodyear USA and three foreign subsidiaries incorporated in Luxembourg, Turkey, and France. The Supreme Court reversed the state court's finding that it could exercise general personal jurisdiction over the foreign subsidiaries in the United States. The foreign subsidiaries had no places of business, employees, or bank accounts in North Carolina. Nor did they design, manufacture, or advertise their products in North Carolina, although a small percentage of their tires was distributed in North Carolina by other Goodyear USA affiliates. 131 S. Ct. at 2851-52. After comparing those facts to *Perkins* and *Helicopteros*, the Supreme Court found that the foreign subsidiaries' "attenuated connections" to North

Carolina fell "far short of 'the continuous and systematic general business contacts'" necessary for general jurisdiction. *Id.* at 2857, quoting *Helicopteros*, 466 U.S. at 416.

B. *Defendants' Contacts with the United States*

Plaintiffs have attempted to support general personal jurisdiction over MKB and OTP by examining all of their contacts with the United States as a whole, as distinct from contacts with the forum state of Illinois. Under Rule 4(k)(2) of the Federal Rules of Civil Procedure, plaintiffs may do so, at least regarding their claims arising under federal or international law. If a foreign defendant is not subject to jurisdiction in any one state's court of general jurisdiction, the rule allows jurisdiction over, and service of process for, federal claims based on all of a defendant's contacts with the entire United States.[8]

Plaintiffs rely on a number of U.S. contacts on the part of defendants. Each bank has account holders who reside in the U.S. OTP has 4,884 accounts worth over $93 million for account holders with U.S. mailing ad-

---

[8] Rule 4(k)(2) was added in 1993 to correct an anomaly in federal law. Without the provision, a foreign defendant who lacked minimum contacts with any one forum state, but who had minimum due process contacts with the United States as a whole, could not be sued in a federal court without its consent. See *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 551 (7th Cir. 2001).

dresses. MKB has approximately 1,500 accounts worth around $147 million for people with U.S. mailing addresses, though for both banks, the accounts themselves are in Hungary. OTP and MKB both have correspondent banking and contractual relationships with U.S. banks and other companies. Some of those contracts contain forum-selection clauses providing for U.S. forums to resolve disputes under the contracts. OTP and MKB personnel have traveled to the United States on business trips. Plaintiffs also argue that the contacts of MKB's parent company, Bayerische Landesbank, which appear to be sufficient to support general jurisdiction, should be imputed to MKB itself. Finally, plaintiffs note that OTP advertises in U.S. publications and in media that target parts of the U.S. audience.

### C. *Analysis*

The proper inquiry is not, as plaintiff's suggest, whether a defendant's contacts "in the aggregate are extensive." The issue under the Due Process Clauses of the Fifth and Fourteenth Amendments is whether the contacts "are so 'continuous and systematic' as to render [defendants] essentially at home in the forum." *Goodyear*, 131 S. Ct. at 2851. MKB's and OTP's contacts with the United States are much more like those in *Helicopteros* and *Goodyear* than they are like the "continuous and systematic" general business in *Perkins*. Even taking plaintiffs' allegations as true, the alleged contacts are not sufficient to render either OTP or MKB "essentially at home" in the United States such that a U.S. court could exercise general jurisdiction over them.

These contacts do not provide a reason for OTP or MKB to expect that they might be sued in any U.S. court for any claim arising anywhere in the world. The OTP accounts owned by U.S. citizens and/or persons with U.S. mailing addresses account for 0.17 percent of OTP's total accounts. The MKB accounts owned by U.S. citizens and/or persons with U.S. mailing addresses account for 0.4 percent of MKB's total accounts. Plaintiffs assert that the number and aggregate value of these accounts establish a prima facie case for sufficient minimum contacts. Plaintiffs are mistaken. In *uBid*, GoDaddy's "hundreds of thousands" of Illinois customers were not sufficient to support general jurisdiction in Illinois. *uBid*, 623 F.3d at 424; see also *Tamburo v. Dworkin*, 601 F.3d 693, 701-02 (7th Cir. 2010) (sales to customers in forum insufficient for general jurisdiction). Likewise, the First Circuit found the fact that a Polish bank, with all of its branches in Poland, had customers with Massachusetts addresses was not sufficient to support Massachusetts' exercise of general jurisdiction, at least where the plaintiff failed to produce any evidence that the Polish bank sought out these customers or purposefully made contact with the forum. *Lechoslaw v. Bank of America, N.A.*, 618 F.3d 49, 54 (1st Cir. 2010); see also *Harris v. Lloyds TSB Bank, PLC*, 281 F. App'x 489, 493 (6th Cir. 2008) ("any bank statements sent to Tennessee [the forum state] would have been sent there because the customers listed the account address as Tennessee, not because Lloyds chose to create continuous and substantial consequences in Tennessee"); *E.I.C., Inc. v. Bank of Virginia*, 166 Cal. Rptr. 317, 320 (Cal. App. 1980) ("Un-

doubtedly a bank the size of Bank of Virginia has deposi-tors who reside throughout the country and overseas, and it would be an absurdity to conclude from this that the bank was doing business in each of the home juris-dictions of its depositors.").

Nor are defendants' contracts with U.S. companies, even those containing U.S. forum-selection clauses, suf-ficient to establish general jurisdiction. For example, we have held that collaborative efforts with an Indiana-based corporation, including several confidentiality agreements and trips to Indiana in furtherance of those agreements, were not continuous and systematic contacts that would subject a defendant to general juris-diction in Indiana. *Purdue Research Foundation*, 338 F.3d at 788; see also *Helicopteros*, 466 U.S. at 411 (defendant who purchased 80 percent of fleet of helicopters from a Texas company over a seven-year period, negotiated and executed the contracts in Texas, received payment from a Texas bank, and sent employees to Texas for training and technical consulting was not subject to general jurisdiction in Texas); *uBid, Inc.*, 623 F.3d at 426 (defendant who marketed and sold registration for Internet domain names, contracted with Illinois cus-tomers, and hosted web sites accessible from Illinois was not subject to general jurisdiction in Illinois); *Johnston v. Multidata Systems Int'l Corp.*, 523 F.3d 602, 614 (5th Cir. 2008) (services received from vendors in the forum were not a significant contact for general jurisdiction purposes); *Vangura Kitchen Tops, Inc. v. C&C North Am., Inc.*, 2008 WL 4540186, at *9 (W.D. Pa. Oct. 7, 2008) (mere existence of forum-selection

clause is not sufficient to give general jurisdiction in the forum).

Plaintiffs assign great weight to OTP's agreement to submit to U.S. jurisdiction in resolving disputes arising out of its agreement with American Express. But that information cuts the other way. While it is true that "choice of law provisions may be some indication that a defendant purposefully has availed itself of the protection of the laws of a particular jurisdiction," *Purdue Research Foundation*, 338 F.2d at 786 (discussing choice of law provisions in the context of *specific* jurisdiction), the "particular jurisdiction" in OTP's case is New York. Even more important, the agreement is limited to disputes arising from one particular contract. If U.S. courts had a sound basis for exercising general jurisdiction over OTP, American Express would not have needed a forum-selection clause in its contract to ensure personal jurisdiction over OTP.

Likewise, defendants' correspondent banking relationships show that they are not "essentially at home" in the United States. That is precisely why correspondent banking relationships are needed and used. "Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers *in jurisdictions where the banks have no physical presence . . . ." United States v. Union Bank for Sav. & Inv. (Jordan)*, 487 F.3d 8, 15 (1st Cir. 2007) (emphasis added). Accordingly, many courts have soundly rejected the suggestion that a correspondent banking relationship with a bank in the forum is sufficient to support

general jurisdiction over a foreign defendant. See *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891-92 (11th Cir. 1983) (holding correspondent banking relationships not enough to support general jurisdiction over nonresident defendant under Florida long-arm statute); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 731-33 (S.D.N.Y. 2010) (maintenance of correspondent accounts in New York insufficient to support exercise of general jurisdiction in the U.S. pursuant to Rule 4(k)(2)); *E.I.C., Inc.*, 166 Cal. Rptr. at 320 ("[M]ost banks of any size maintain correspondents in all major regions of the country and in selected areas overseas. It would be a distortion of due process to hold that a state acquires general personal jurisdiction over an out-of-state bank . . . merely because the bank has a correspondent relationship with a bank within the state and a balance on deposit with its correspondent bank."). Plaintiffs have not identified, and we have not found, any contrary authority regarding general jurisdiction.

Over the last four years, various OTP personnel took 53 business trips to the United States, 42 of which were for conferences or seminars. These trips are much more closely akin to the training trips to Texas taken by Helicol employees in *Helicopteros* than they are to the facts in *Perkins*, where the president of the company worked out of an office in Ohio for several years during the Japanese occupation of the Philippine Islands. These "sporadic contacts" are not so "continuous and systematic" as to support general jurisdiction. See *Tamburo*, 601 F.3d at 701 (rejecting general jurisdiction where

one defendant visited the forum twice in ten years and another had visited the forum five times).

Plaintiffs ask that the contacts of MKB's parent company, Bayerische Landesbank, be imputed to MKB. (We assume for purposes of argument that Bayerische Landesbank has sufficient contacts to support general jurisdiction in the United States.) We confronted a similar issue in *Purdue Research Foundation*, where plaintiffs argued that a foreign defendant was subject to general jurisdiction in Indiana based on the contacts of a wholly-owned subsidiary. 338 F.3d at 787-88. There, we applied the "general rule" that "the jurisdictional contacts of a subsidiary corporation are not imputed to the parent." *Id.* at 778 n.17; *Central States, Se. and Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000) ("[C]onstitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary."); see also *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary.").

As in *Purdue Research Foundation*, plaintiffs here argue against the general rule based on the fact that Bayerische Landesbank executives hold four out of nine seats on

MKB's Board of Supervisors. Imputation, however, requires "an unusually high degree of control" or that the subsidiary's "corporate existence is simply a formality." *Purdue Research Foundation*, 338 F.3d at 788 n.17 (rejecting effort to base jurisdiction on corporate affiliate's contacts). There is no suggestion of either in this case. The interaction alleged between MKB and Bayerische Landesbank is not sufficient to establish that Bayerische Landesbank controls and dominates MKB to such an extent that its jurisdictional contacts should be imputed to MKB. Cf. *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) ("Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent, but unless there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent, the parent is not liable for those torts, and cannot be served under the tort provision of the long-arm statute.") (internal citations omitted); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) ("The officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction."). Plaintiffs have offered no basis for piercing the separate corporate identities in this case.

Finally, the minor amount of advertising that reaches the United States is not sufficient to support general jurisdiction over OTP. In *uBid, Inc.*, GoDaddy's contacts with the forum state included the marketing and sale

of registrations for Internet domain names, as well as contracts with many Illinois customers and the hosting of web sites accessible from Illinois. 623 F.3d at 426. These "extensive and deliberate" contacts were part of the set of contacts that supported specific jurisdiction, but not the general jurisdiction that plaintiffs rely upon in this case.

Plaintiffs correctly point out that general personal jurisdiction must be evaluated based on the totality of the defendant's contacts with the forum, and we have considered the contacts both individually and in their totality. The contacts identified here fall well short of any case cited by plaintiffs finding general jurisdiction, or any case we have found. Binding Supreme Court precedents, including *Perkins*, *Helicopteros*, and *Goodyear*, and binding Seventh Circuit precedents, such as *uBid*, and *Purdue Research Foundation*, establish that the district court cannot possibly exercise general personal jurisdiction over MKB or OTP. Neither defendant meets the stringent "essentially at home" standard.[9]

---

[9] When we pressed plaintiffs for their best authority supporting the exercise of general jurisdiction here, they cited *ISI International, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001). That case explained how Rule 4(k)(2) works, but it applied only to specific jurisdiction, holding that a federal district court had jurisdiction over a foreign defendant on claims arising from that defendant's contacts with the United States in the disputed transaction itself. *ISI International* adds no support for the attempt to exercise general jurisdiction over these foreign defendants.

D. *The Supreme Court Precedents and the Scope of Rule 4(k)(2)*

To avoid these controlling precedents that require dismissal on personal jurisdiction grounds, plaintiffs advance several legal arguments challenging their relevance. The district court dismissed *Goodyear* and *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), as "not on point as far as personal jurisdiction is concerned in this case." 807 F. Supp. 2d at 704. In that same vein, plaintiffs argue that *Goodyear* and *J. McIntyre* are "limited to analyzing whether the 'stream-of-commerce' doctrine that can bolster a *state* court's exercise of *specific* jurisdiction over a foreign corporation would be enough by itself to also establish general jurisdiction." These efforts to avoid the Supreme Court's authoritative teachings are not at all persuasive. *Goodyear* and *J. McIntyre* state clearly the requirements for exercising general personal jurisdiction and the differences between general and specific personal jurisdiction. See *Goodyear*, 131 S. Ct. at 2850-51 (explaining the difference between general and specific jurisdiction); *id.* at 2853-54 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home."); *id.* at 2854 (noting the Court had considered the general jurisdiction standard only twice since *International Shoe*, in *Perkins* and *Helicopteros*); *J. McIntyre Mach., Ltd.*, 131 S. Ct. at 2786-87 (plurality opinion) (discussing the due process considerations that underlie the personal jurisdiction inquiry); *id.* at 2791 ("Due process protects

petitioner's right to be subject only to lawful authority."). As *Goodyear* and *J. McIntyre* reaffirm, due process considerations are present in all personal jurisdiction inquiries — regardless of whether it is a state or federal court or whether the inquiry involves specific or general personal jurisdiction.

Rule 4(k)(2) does not help plaintiffs with the due process issue. Rule 4(k)(2) permits the aggregation of contacts nationwide for the unusual situation where a defendant's contacts with any given state are not extensive enough to support that state's exercise of personal jurisdiction, but there are sufficient minimum contacts with the nation as a whole. An example is *ISI International*, where the Canadian defendant had a little contact with Illinois, a little with California, a little with the District of Columbia, and a little more with Michigan. 256 F.3d at 551. Although the minimal contacts with each state were not sufficient to support jurisdiction in any one state's courts, the aggregate contacts with the United States as a whole were sufficient to authorize specific jurisdiction in the United States, so Rule 4(k)(2) applied. *Id*.

Plaintiffs' argument loses sight of the fundamental due process requirements that apply in both state and federal courts. Plaintiffs, in asserting that Rule 4(k)(2) relaxes the minimum-contacts inquiry, seem to argue that the constitutional standards for the exercise of personal jurisdiction vary depending on whether the action is in a state court or a federal court. We find no merit in this position and no support within *Goodyear*,

*J. McIntyre*, or any other case. As the rule itself acknowledges, all exercises of jurisdiction by a federal court must be "consistent with the United States Constitution and laws." While Rule 4(k)(2) applies a broader geographic standard for which contacts are relevant, the *minimum* in the "minimum contacts" that are constitutionally sufficient to support general or specific jurisdiction is the same. The rule does not and could not relax the requirement that a defendant be "essentially at home" in the forum state or nation for a court to exercise general jurisdiction over it. The difference between litigating under state law in state court and under federal law in federal court is that the federal Constitution and federal law allow a plaintiff to aggregate a defendant's contacts with the entire nation rather than with the forum state. The underlying constitutional requirements for minimum contacts under either a general jurisdiction or specific jurisdiction analysis remain the same. Plaintiffs have not shown even an arguable basis for general personal jurisdiction over MKB or OTP.

## Conclusion

A district court's erroneous denial of a motion to dismiss for lack of personal jurisdiction is ordinarily not reviewable in this court without either a final judgment or a § 1292(b) certification for interlocutory appeal. Appeal Nos. 11-2353, 11-2386, and 11-2875 are therefore DISMISSED. This is the rare case, however, in which it is appropriate for this court to exercise its discretion

to issue a writ of mandamus to confine the district court to the exercise of its lawful jurisdiction. What makes this the rare case is the combination of the extraordinary scale of the litigation, the inherent involvement with U.S. foreign policy, and the crystal clarity of the lack of any foundation for exercising general personal jurisdiction over MKB or OTP in the courts of the United States. MKB and OTP have established that they have a clear right to writs of mandamus. They have no other adequate means to achieve their desired relief, and we are persuaded that issuance of a writ is otherwise appropriate. Accordingly, the petitions for writs of mandamus in Nos. 11-3247 and 11-3249 are hereby GRANTED, and the district court shall dismiss plaintiffs' claims against MKB and OTP for lack of personal jurisdiction. This decision should not, of course, block plaintiffs from pursuing their claims in another forum, but they cannot proceed against these defendants in U.S. federal courts.