In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 07-4023

JEAN MCCARTER, *et al.*,

*Plaintiffs-Appellants*,

*v.*

RETIREMENT PLAN FOR THE DISTRICT MANAGERS OF THE
AMERICAN FAMILY INSURANCE GROUP, *et al.*,

*Defendants-Appellees*.

————————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:07-cv-00206-bbc—**Barbara B. Crabb**, *Chief Judge*.

————————

ARGUED MAY 28, 2008—DECIDED SEPTEMBER 2, 2008

————————

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. American Family Insurance
Group amended its pension plans in 1997 to allow partici-
pants to elect cash distributions (with values actuarially
equal to the participants' vested pensions) when they
leave its employ. As amended, the plans give workers
90 days to choose whether to take lump sums immedi-

ately or annuities when they reach retirement age. Plaintiffs exercised the lump-sum option. Now they regret their decisions and say that the plans should have let them defer the choice until normal retirement age. Allowing only 90 days makes people too likely to accept cash, plaintiffs maintain. Although a lump-sum distribution must be rolled over into another pension investment, it can be withdrawn and spent (after a tax penalty has been paid), leaving people with less income at retirement age. Plaintiffs believe that they are entitled to choose again—and, even if they have dissipated the money they received, that they remain entitled to an annuity once they reach retirement age.

None of the plaintiffs is willing to restore the cash to the pension plan. This led the district court to dismiss the suit for want of standing. The plaintiffs got what they asked for (immediate distribution) and can't complain about the lack of a windfall (the value of the pension twice: once in cash and again as an annuity). But if the Employee Retirement Income Security Act (ERISA) *entitles* them to revoke their elections yet keep the cash, it is not appropriate to dismiss the suit for lack of a case or controversy. Pension plans may distribute their benefits as lump sums only with participants' consent, 29 U.S.C. §1053(e)(1), and plaintiffs maintain that their consents are void because they should have had more time to choose. The injury they assert—that monthly income at retirement age is diminished if participants are stampeded into taking cash, which then burns holes in their pockets—can be traced to the plans' terms and can be redressed by a judgment in plaintiffs' favor. No more is

required for standing. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs' claim may be weak, but the shortcomings of a legal theory differ from a lack of subject-matter jurisdiction. *Bell v. Hood*, 327 U.S. 678 (1946).

American Family tells us that it gives departing employees only 90 days to choose because an indefinitely long window would lead to adverse selection. Ex-employees would be tempted to wait to see how their health and family circumstances developed. Those whose health deteriorated would take the lump-sum option, because income deferred past death is useless (you can't take it with you) unless the participant wants to make a bequest; likewise those without a spouse or children would take the cash and buy an annuity that lacked survivorship features and thus paid a higher monthly benefit. Meanwhile healthy ex-workers, and those with large families, would take the pension option. A pension plan with longer-lived participants, or more than the average number of people eligible for survivors' benefits, is more expensive to maintain. Giving ex-workers a short time to elect between cash and an annuity reduces the opportunity for strategic behavior that is costly not only for the plan but also for other participants, whose benefit levels must be cut if the employer wants to keep pension costs stable. (This also shows another reason why plaintiffs suffered injury in fact: a lump-sum option open for a brief time is worth less to the participant than an option that is always available and can be exercised at a well chosen moment.)

Plaintiffs do not deny that adverse selection is the likely outcome of a long window. But they say that the cost

to the employer is irrelevant under 26 C.F.R.
§1.411(a)–11(c)(2)(i), which they read to provide that no
pension plan may impose a "significant detriment" on
a participant who declines the opportunity for a cash
distribution. This is the language on which plaintiffs rely:

> No consent [to immediate distribution of a lump
> sum] is valid unless the participant has received a
> general description of the material features of the
> optional forms of benefit available under the
> plan. In addition, so long as a benefit is immedi-
> ately distributable, a participant must be informed
> of the right, if any, to defer receipt of the distribu-
> tion. Furthermore, consent is not valid if a signifi-
> cant detriment is imposed under the plan on any
> participant who does not consent to a distribution.
> Whether or not a significant detriment is imposed
> shall be determined by the Commissioner by
> examining the particular facts and circumstances.

This regulation does not help plaintiffs, for two prin-
cipal reasons.

First, although subsection (c)(2)(i) when read alone
sounds like a substantive regulation of pension plans, the
context shows otherwise. This is a *tax* regulation, and it
defines whether a pension plan is qualified for favorable
tax treatment (principally deferral of income tax on the
value of pension contributions). Subsection 1.411(a)–11(a)
sets out the consequence of failure to satisfy the require-
ments in the other subsections: "If the consent require-
ments or the valuation rules of this section are not satis-
fied, the plan fails to satisfy the requirements of [26

U.S.C. §411(a)]." Section 411 spells out which plans are "qualified trusts" meeting the standards of 26 U.S.C. §401 for tax deferral. Plaintiffs equate "not tax-qualified" with "not lawful," but there's no basis for thinking that only those pension plans eligible for tax benefits are lawful under ERISA. See *Brengettsy v. LTV Steel Hourly Pension Plan*, 241 F.3d 609 (7th Cir. 2001). Many pension plans provide benefits exceeding the maximum on which taxes can be deferred, and so are not tax-qualified, but are perfectly lawful; likewise top-heavy plans (those that provide extra benefits to workers with higher incomes) may be ineligible for tax deferral but satisfy all of ERISA's substantive rules.

Second, even if §1.411(a)–11(c)(2)(i) established substantive requirements, it would not entitle plaintiffs to relief. They want us to treat the need to make a prompt choice as a "significant detriment". That can't be so; subsection (c)(2)(i) says that the participant must be informed of "the right, *if any*, to defer receipt of the distribution" (emphasis added), which must mean the lack of a right to defer receipt of cash is not itself a "significant detriment".

Having a limited time to choose cash does not diminish the value of a pension. Until 1997 employees who left American Family were not entitled to lump-sum distributions; they had to wait for an annuity to commence at retirement age. When the option to take a cash distribution was added in 1997, the value of the annuity was unchanged. Adding a lump-sum option to an existing (and entirely lawful) pension annuity does not create a

"detriment" of any kind; it bestows a benefit by making the package of options more valuable. Participants do not lose anything (other than the opportunity to receive an immediate distribution) by turning down the lump-sum offer.

Pension and welfare plans often contain limited-time opportunities. Think of an opportunity to take early retirement. That offer would be worth more if held open for a longer time, but extending an offer with a short fuse does not diminish the value of the regular pension benefit or otherwise make the choice involuntary. As we concluded in *Henn v. National Geographic Society*, 819 F.2d 824 (7th Cir. 1987), an offer that increases employees' opportunities—the sort of offer that they would pay to receive, rather than pay to avoid—is lawful, and the choice is binding even if with the benefit of hindsight the employee would have made a different election.

No more need be said about the merits, but a procedural complication remains. After dismissing the suit, the district court ordered plaintiffs to pay the plans' legal fees. The judge relied on 29 U.S.C. §1132(g), which allows fee-shifting in ERISA actions when the loser's position was not substantially justified. (The statute itself is silent on the standard; we borrowed "substantially justified" from the Equal Access to Justice Act. See *Bittner v. Sadoff & Rudoy Industries*, 728 F.2d 820, 828–31 (7th Cir. 1984).) Plaintiffs want us to reverse this decision. The district court has not, however, quantified the award, and until it does the decision is not final. See, e.g., *Riley v. Kennedy*, 128 S. Ct. 1970, 1980–81 (2008); *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737 (1976).

When raising this subject on appeal, plaintiffs assumed that awards of attorneys' fees are covered by a single notice of appeal from the final decision on the merits. The Supreme Court held otherwise in *White v. New Hampshire Department of Employment Security*, 455 U.S. 445 (1982), concluding that awards of attorneys' fees under fee-shifting statutes are separate decisions, separately appealable just like awards of costs. The Court reached this conclusion in part to prevent disputes about the timeliness of appeals and in part so that lingering controversy about attorneys' fees would not delay appellate resolution of the merits, which otherwise would have to wait for the fees to be quantified. But the upshot of *White*'s approach is that decisions on the merits and decisions about attorneys' fees are treated as separate final decisions, which must be covered by separate notices of appeal—each filed after the subject has independently become "final." Amendments to the Federal Rules of Civil Procedure after *White* fortified the distinction between a final decision on the merits and a final decision on attorneys' fees (or costs). See Fed. R. Civ. P. 54(d)(2), 58(e). This is why we have been able to address the merits of plaintiffs' appeal even though the case remains live in the district court until the judge has told plaintiffs how much they must pay toward the plans' legal expenses. And it is also why we cannot reach that dispute—not only because the decision about fees is not final, but also because plaintiffs have not filed a notice of appeal concerning that decision. (A timely notice of appeal is a jurisdictional requirement. *Bowles v. Russell*, 127 S. Ct. 2360 (2007).)

Twenty-four years ago, we concluded in *Bittner* that "pendent appellate jurisdiction" permits a court of appeals to review a district court's decision to award attorneys' fees to a prevailing party, even when the fees have not been quantified and the award thus is not final. 728 F.2d at 826–27. About a decade after *Bittner*, however, the Supreme Court threw cold water on pendent appellate jurisdiction. The Court observed in *Swint v. Chambers County Commission*, 514 U.S. 35, 43–51 (1995), that resolving appeals from non-final decisions is not only incompatible with 28 U.S.C. §1291 but also unnecessary, because Congress has authorized the judiciary to adopt rules allowing interlocutory appeals. 28 U.S.C. §1292(e). *Swint* pointedly remarked that these rules must be adopted after public notice and comment, and approval by the Judicial Conference and the Supreme Court: in other words, that the subject has been taken out of the hands of the intermediate appellate courts in the federal system. Although *Swint* said that it was not ruling out all possibility of pendent appellate jurisdiction, the Court made clear that only the most extraordinary circumstances could justify the use of whatever power the courts of appeals possess—and that even when circumstances are exceptional the availability of pendent appellate jurisdiction is doubtful. *Swint* itself held that a court of appeals had erred in invoking pendent appellate jurisdiction, because "judicial economy" is no warrant for disregarding the statutory final-decision rule.

*Swint* supersedes *Bittner*, because there is nothing extraordinary about a losing party's desire to be rid of a fee award before the obligation has been set. There is no urgent need for haste, and a substantial reason to wait—for

most awards are likely to be affirmed, and then a second appeal will follow from the district judge's order specifying the amount of fees. Judicial economy cannot be achieved by dividing one dispute across two appeals. All that results from multiple appeals is delay and expense. That's precisely why appeal usually must await a final decision.

Yet although *Swint* pulled the rug out from under *Bittner* (as did the 1993 amendments to Rules 54 and 58 specifying that the merits and awards of attorneys' fees are separately appealable decisions), our circuit has proceeded as if nothing had happened. At least two of our post-*Swint* opinions invoke the doctrine of pendent appellate jurisdiction to review awards of attorneys' fees before the district judge had decided how much was due. See *Lorillard Tobacco Co. v. A&E Oil, Inc.*, 503 F.3d 588 (7th Cir. 2007); *Kokomo Tube Co. v. Dayton Equipment Services Co.*, 123 F.3d 616, 621–22 (7th Cir. 1997). Neither of these decisions mentions *Swint*; they proceed as if *Bittner* were the last word.

Even before *Swint*, four courts of appeals had disagreed with *Bittner* and held that appellate resolution must be postponed until the amount of fees has been quantified. See *Cooper v. Salomon Brothers Inc.*, 1 F.3d 82, 84–85 (2d Cir. 1993); *Pennsylvania v. Flaherty*, 983 F.2d 1267, 1275–77 (3d Cir. 1993); *Southern Travel Club, Inc. v. Carnival Air Lines, Inc.*, 986 F.2d 125, 129–31 (5th Cir. 1993); *In re Modern Textile, Inc.*, 900 F.2d 1184, 1192 (8th Cir. 1990). After *Swint*, another circuit joined this group. *American Soda, LLP v. U.S. Filter Wastewater Group, Inc.*, 428 F.3d 921 (10th Cir. 2005). And although before *Swint* two circuits had fol-

lowed *Bittner*, see *Andrews v. Employees' Retirement Plan of First Alabama Bancshares, Inc.*, 938 F.2d 1245, 1247–48 & n.6 (11th Cir. 1991); *Morgan v. Union Metal Manufacturing*, 757 F.2d 792, 795–96 (6th Cir. 1985) (dictum), neither of these circuits has entertained a fee appeal under the approach of pendent appellate jurisdiction after *Swint*. Indeed, as far as we can see, no decision outside this circuit has invoked pendent appellate jurisdiction since *Swint* to entertain an appeal from an un-quantified award of attorneys' fees. This circuit now stands alone.

*Bittner* preceded *Swint* and cannot be faulted for failing to anticipate how the Supreme Court would approach this subject. Now that the Justices have spoken, however, we are not justified in adhering to an approach that perpetuates an unnecessary conflict among the circuits. The portions of *Bittner*, *Kokomo Tube*, and *Lorillard Tobacco* that invoked pendent appellate jurisdiction are over-ruled. An appeal may be taken from an award of attorneys' fees only after that award is independently final—which means, after the district judge had decided how much must be paid. This decision was circulated to all active judges under Circuit Rule 40(e). No judge favored a hearing en banc.

The district court's decision is modified to be on the merits (as opposed to a dismissal for lack of standing), and as so modified is affirmed. The appeal is dismissed to the extent it seeks review of the non-final decision that plaintiffs must reimburse the defendants' attorneys' fees.