In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3715, 12-2032

TRADESMAN INTERNATIONAL, INC.,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

JOHN BLACK, *et al.,*

*Defendants-Appellees,*
*Cross-Appellants.*

Appeals from the United States District Court for the
Central District of Illinois.
No. 2:10-cv-02098-DGB — **David G. Bernthal**, *Magistrate Judge.*

ARGUED SEPTEMBER 25, 2012 — DECIDED AUGUST 1, 2013

Before KANNE, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* John Black, Todd Walker, Ryan Ellis, and Ryan Boyer all held upper-level management positions at Tradesmen International, Inc., a construction staffing company, when they first began to discuss forming their own competing company in August 2009. Over the course of twelve years at

Tradesmen, Ellis had risen from an entry-level field representa-
tive position to become the Area Manager of the Ohio Valley;
Black, Walker, and Boyer had risen from entry-level field
representative positions to become the General Managers of
three Tradesmen Indiana field offices over the course of two,
four, and eight years, respectively. When Black resigned from
Tradesmen on October 5, 2009 after refusing to accept a
demotion, the discussions among the four men became "more
specific." Soon after, their new company, Professional Labor
Support (PLS), was born.

On May 5, 2010, Tradesmen filed suit against Black, Walker,
Ellis, Boyer, and PLS alleging ten counts: breach of contract,
misappropriation of trade secrets, misappropriation of confi-
dential information, a declaratory judgment with respect to the
enforceability of the defendants' covenants not to compete
(CNTCs) with Tradesmen, permanent injunctive relief, breach
of the duty of loyalty, tortious interference with contractual
relations, tortious interference with business expectancy,
conversion, and civil conspiracy. Six months into the lawsuit,
on November 11, 2010, defendant Ellis filed for Chapter 7
bankruptcy, and all proceedings against Ellis were stayed. The
lawsuit continued on for the remaining defendants, however,
and on November 7, 2011, the district court granted summary
judgment to Black, Walker, Boyer, and PLS on all counts except
the declaratory judgment count. With respect to the declara-
tory judgment count, the district court found it moot since all
of the defendants' CNTCs had already expired. The district
court also denied permanent injunctive relief to Tradesmen.
The remaining defendants subsequently filed a motion for

attorneys' fees, which the district court denied on April 13, 2012.

Tradesmen filed a timely notice of appeal of the November 7, 2011 summary judgment order; however, Tradesmen never sought certification under Fed. R. Civ. P. 54(b), even though the November 7, 2011 order did not end the action as to all of the parties. (The claim against Ellis remains pending to this day.) Black, Walker, Boyer, and PLS filed a timely cross-appeal in return on the attorneys' fees issue. Unlike Tradesmen, however, Black, Walker, Boyer, and PLS were concerned about whether the Seventh Circuit had jurisdiction to hear the appeal since the action was still pending against Ellis, and they successfully obtained Rule 54(b) certification for their cross-appeal. Because the November 7, 2011 summary judgment ruling is not a final decision under *Kimbrell v. Brown*, 651 F.3d 752, 758 (7th Cir. 2011), we lack jurisdiction to hear Tradesmen's appeal under 28 U.S.C. § 1291. We do, however, have jurisdiction to hear Tradesmen's appeal with respect to the district court's denial of injunctive relief (Count V of the complaint) under 28 U.S.C. § 1292(a)(1), which allows us to hear appeals from "[i]nterlocutory orders of the district courts … refusing … injunctions." Therefore, Tradesmen must wait to appeal the other nine counts in its complaint until its claims against Ellis are resolved. With respect to the district court's denial of injunctive relief—the only part of Tradesmen's appeal that we have jurisdiction to hear—we affirm the district court because Tradesmen has failed to show that it suffered any harm at all, let alone irreparable harm, from the remaining defendants' actions. With respect to the remaining defendants' cross appeal on attorneys' fees, we have jurisdiction to hear the

appeal under *McCarter v. Retirement Plan for District Managers of American Family Insurance Group*, 540 F.3d 649, 654 (7th Cir. 2008) (holding that an "appeal may be taken from an award of attorneys' fees only after that award is independently final—which means, after the district judge had decided how much must be paid."). We find that the district court used the incorrect standard in its decision to deny attorneys' fees, so we reverse and remand the attorneys' fees issue with instructions to the district court on the correct standard to apply.

## I

After Black's resignation from Tradesmen, the defendants moved quickly to establish their new company, PLS. On October 27, 2009, less than a month after his resignation from Tradesmen, Black organized PLS as an Illinois limited liability company. Only a few weeks afterward, on November 19, 2009, Black, Walker, and Boyer signed an office lease. By January 12, 2010, Black, Walker, Boyer, and Ellis had all left their jobs at Tradesmen, and by March 2010, PLS had made its first sale.

Despite their haste in establishing PLS, the defendants were generally "very careful" during the startup process, as their counsel pointed out in oral argument. Black, Walker, Boyer, and Ellis had all signed CNTCs during their employment with Tradesmen, and the defendants attempted to abide by their terms. Because the defendants had different jobs that serviced different areas, the geographic restrictions in each defendant's CNTC were different. Black, Boyer, Walker, and Ellis were explicitly prohibited from interfering with Tradesmen's business in certain Indiana counties. Walker was also prohibited from interfering with Tradesmen's business in three Ohio

counties. All defendants were prohibited from soliciting construction staffing business within one hundred miles of a Tradesmen field office and within twenty-five miles of any location at which Tradesmen provided services. As a result, the defendants decided to establish PLS in Mahomet, Illinois because Tradesmen had no local presence there. Beginning in January 2010, the four men "lived several days a week in an apartment … away from their wives and children in Indiana" as they endeavored "to start … without soliciting business from its Members' old Tradesmen accounts and contacts."

The only exceptions to the general care that the defendants took when establishing PLS are the emails that Boyer and Walker sent during their last month of employment at Tradesmen. Between December 4, 2009 and January 4, 2009, these two defendants sent emails to their personal email accounts and to Black with attachments that included Tradesmen's workers' compensation rates, manager compensation rates, marketing materials, and potential customer reports purchased from Dun & Bradstreet. The defendants presented unrebutted evidence that they never used any of these email attachments in starting PLS; still, the defendants' attorney admitted at oral argument that the email attachments "are the worst facts in the case for us."

Otherwise, the defendants appeared to have tried to abide by the terms of the CNTCs throughout their durations. The duration of Black, Boyer, and Walker's CNTC was eighteen months from the time that they left Tradesmen; the duration of Ellis's CNTC was only twelve months. The first CNTC to expire was Ellis's on January 12, 2011; the last was Walker's on July 12, 2011. While their CNTCs were in effect, PLS did not

work for any of the defendants' previous customers at Tradesmen; in fact, PLS actually turned down work from previous customers who contacted the defendants at PLS. (The one exception is Ellis, the defendant who is not a party to this appeal. Because Ellis's CNTC expired before the other defendants' CNTCs, Ellis completely relinquished his membership in PLS in January 2011 and formed his own company, PLS of Indiana, which has apparently worked for Ellis's previous customers at Tradesmen.)

Nonetheless, Tradesmen was upset by the defendants' actions (and apparent ability to build a successful new business), and Tradesmen filed suit against Black, Ellis, Boyer, Walker, and PLS. In granting summary judgment to Black, Boyer, Walker, and PLS (since the action against Ellis was stayed), the district court focused on Tradesmen's failure to prove damages—even with regards to the improper emails that the defendants sent in December 2009 and January 2010. Tradesmen, which sought injunctive relief, lost profits, and compensatory damages from the defendants, submitted only two pieces of evidence to establish its damages: (1) Tradesmen's gross sales figures for clients that PLS had allegedly solicited in violation of the defendants' CNTCs, and (2) PLS's gross sales figures. Many of the documents with Tradesmen's gross sales figures did not contain a company name. Moreover, Tradesmen never made clear how the court was supposed to interpret these documents. Perhaps Tradesmen expected the court to assume that PLS's overall gross sales figures represented the amount of business that Tradesmen lost to PLS (which would have been a terrible assumption given that Tradesmen had no local presence in Mahomet, Illinois). Nor

were Tradesmen officials any help in interpreting these documents for damage purposes; Tradesmen's Fed. R. Civ. P. 30(b)(6) designee testified in his deposition as follows:

> Q. What's the company's position on how these two documents support its claim for lost business damages?
>
> A. What was the question again? … I don't know.
>
> Q. Do these two documents show a computation of any lost business damages that Tradesmen is claiming against Professional Labor Support or any of the defendants?
>
> A. I don't know.

On all accounts, Tradesmen left the district court to speculate both *whether* the defendants had harmed it and *how* the defendants had harmed it. Yet even Tradesmen admits in its brief that it was obligated to prove damages with "reasonable certainty" and "without speculation." The district court found that, given the incomprehensible collection of documents that Tradesmen had provided, any determination of harm from these documents would be "unduly speculative." Consequently, the district court granted summary judgment to all defendants except Ellis on all claims (except Count IV, the declaratory judgment action, which it dismissed as moot since the CNTCs had all expired). The district court further denied permanent injunctive relief to Tradesmen.

Nine days after prevailing on the merits of the case, Black, Boyer, Walker, and PLS filed a motion to recover attorneys'

fees under the Illinois Trades Secrets Act (ITSA), claiming that Tradesmen had "maintained its trade secrets misappropriation claim in bad faith." The relevant language of ITSA, contained in 765 Ill. Comp. Stat. 1065/5, provides, "If (i) a claim of misappropriation is made in bad faith, … the court may award reasonable attorney's fees to the prevailing party." Here, the remaining defendants pointed to Tradesmen's overall lack of evidence on damages and Tradesmen's wholly uninformed Fed. R. Civ. P. 30(b)(6) witness as evidence that Tradesmen had "made" its claim against them in bad faith. On April 13, 2011, the district court denied the remaining defendants' motion for attorneys' fees. Interpreting the ITSA "made in bad faith" language for the first time, the district court decided that a claim made in bad faith must be "initiated" in bad faith at the time of filing. Because the district court was "unwilling to conclude that Plaintiff's [Tradesmen's] trade secrets claim was initiated in bad faith," the district court found that Tradesmen had not "made" its claim against the remaining defendants in bad faith, and consequently, denied the defendants' motion for attorneys' fees.

The district court's rulings on summary judgment, permanent injunctive relief, and attorneys' fees are all before this court now on appeal. Each ruling in this case carries a different appellate review standard. We review a district court's grant of summary judgment *de novo*, "construing all facts and drawing all inferences in the light most favorable to the non-moving party," which, here, is Tradesmen. *Lagestee-Mulder, Inc. v. Consol. Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir. 2012). We review a district court's denial of permanent injunctive relief under the abuse of discretion standard. *3M v. Pribyl*, 259 F.3d

587, 597 (7th Cir. 2001). Finally, although we review a district court's denial of attorneys' fees for abuse of discretion, *BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1099 (7th Cir. 1994), we review a district court's interpretation of any statute (including an attorneys' fees statute) under a *de novo* standard, *Storie v. Randy's Auto Sales, LLC,* 589 F.3d 874, 876 (7th Cir. 2009). Before we can proceed with any appellate review, however, we must clarify the elements of the district court's ruling for which we have jurisdiction to conduct appellate review. We turn to a clarification of our jurisdiction now.

## II

Tradesmen asserts two alternative jurisdictional grounds for this court to hear its appeal from the district court's summary judgment and injunctive relief rulings at the present time. First, Tradesmen argues that we have jurisdiction to hear its appeal under 28 U.S.C. § 1291 because "the parties consented in writing to the entry of a final judgment by Magistrate Judge David G. Bernthal." Second, Tradesmen argues that we have jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court order denied it permanent injunctive relief. We will address each of Tradesmen's argument in turn.

Tradesmen's first jurisdictional argument completely ignores our recent case, *Kimbrell v. Brown,* 651 F.3d 752 (7th Cir. 2011). In *Kimbrell,* the victim of a motor-vehicle accident brought a personal injury suit against both the truck driver who hit him and the truck driver's employer. The truck driver filed for bankruptcy, and the district court stayed the proceedings against him. Subsequently, the District Court granted the employer's motion to dismiss and "terminated" the case with

respect to the employer. *Id*. at 754. When the plaintiff attempted to appeal the district court's decision with respect to the employer, we dismissed the appeal for lack of jurisdiction. We held, "Kimbrell's case remains 'open,' 'unfinished,' and 'inconclusive' in the district court, so there was no final judgment." *Id*. at 758 (quoting *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 661 (7th Cir. 1998)). In issuing this decision, we distinguished a Third Circuit case, *Robison v. Canterbury Village, Inc.*, 848 F.2d 424 (3d. Cir. 1988), which allowed a plaintiff to appeal a judgment against one defendant when the case remained stayed against another defendant who had filed for bankruptcy. The plaintiff in *Robison* had obtained certification under Fed. R. Civ. P. 54(b) from the District Court before appealing. Kimbrell, in contrast, "made no attempt to obtain a Rule 54(b) certification." *Kimbrell*, 651 F.3d at 758.

Like Kimbrell, Tradesmen made no attempt to obtain Rule 54(b) certification, nor could Tradesmen explain at oral argument why it had not obtained Rule 54(b) certification. Another option for Tradesmen would have been to seek relief from the bankruptcy stay; again, Tradesmen had no answer at oral argument as to why it had not pursued this relief. Indeed, Tradesmen conceded at oral argument that it had no answer to *Kimbrell*. The fact that the parties "consented in writing to the entry of a final judgment" is not enough for jurisdiction under 28 U.S.C. § 1291. As we have repeatedly stated, "the parties cannot consent to this court's jurisdiction; we must satisfy ourselves that appellate jurisdiction is secure." *Gen. Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 378 (7th Cir. 2011). Consent or no consent, Magistrate Judge Bernthal's order was

not a final judgment, and as a result, this court does not have jurisdiction to hear Tradesmen's appeal under 28 U.S.C. § 1291.

Tradesmen's second jurisdictional argument, based on 28 U.S.C. § 1292(a)(1), fares better than its first. Because the district court refused to grant permanent injunctive relief (Count V of Tradesmen's complaint), we have jurisdiction under 28 U.S.C. § 1292(a)(1) to review this refusal. Because we have jurisdiction to hear Tradesmen's appeal of Count V, Tradesmen argues that we have jurisdiction to hear Tradesmen's appeal of the other nine counts because the district court's grant of summary judgment on eight counts and dismissal on one count are "inextricably bound" with its ruling on Count V. *Schirmer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010). Tradesmen misreads our case law. *Schirmer* holds that when a "district court's grant of summary judgment [i]s 'inextricably bound' to the injunction, we have *limited jurisdiction* to review that grant of summary judgment as well, *to the extent necessary. Id.* (emphasis added). As we held in *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1124 (7th Cir. 1983), "[b]ecause § 1292(a)(1) is an *exception* to an otherwise fundamental rule of federal appellate jurisdiction, its scope should be construed with great care and circumspection." Therefore, 28 U.S.C. § 1292(a)(1) gives us jurisdiction to review the district court's denial of permanent injunctive relief to Tradesmen, but it does not give us jurisdiction to review the district court's decision on the other nine counts. Therefore, Tradesmen's appeal is limited to Count V of its complaint, and Tradesmen must wait to appeal the other nine counts until its claims against Ellis are resolved.

In addition to our jurisdiction over Tradesmen's appeal on Count V, we also have jurisdiction over the defendants' cross-appeal on attorneys' fees. As the defendants correctly point out in their brief, jurisdiction over "PLS' cross-appeal depends on the Court's jurisdiction over Tradesmen's appeal." If we lacked jurisdiction over all parts of Tradesmen's appeal, then we would also lack jurisdiction to hear the defendants' cross-appeal (even though the defendants obtained Fed. R. Civ. P. 54(b) certification). In *Mulay Plastics, Inc. v. Grand Trunk Western Railroad Co.*, 742 F.2d 369, 370 (7th Cir. 1984), we held that an award of attorneys' fees "usually does not … inflict irreparable harm on the party." Therefore, an appeal concerning attorneys' fees alone does not meet the requirements of 28 U.S.C. § 1292(a)(1), and we lack jurisdiction to hear it.

Nevertheless, we do have jurisdiction to hear the defendants' appeal regarding attorneys' fees under the doctrine of pendent appellate jurisdiction. Pendent jurisdiction has been generally disfavored since *Swint v. Chambers County Commission*, 514 U.S. 35, 49-50 (1995) (expressing "concern … that a rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay … collateral orders into multi-issue interlocutory appeal tickets"). Moreover, our court held in *McCarter*, 540 F.3d at 654, that we lack pendent appellate jurisdiction "to entertain an appeal from an un-quantified award of attorneys' fees." Nevertheless, we do have pendent appellate jurisdiction to entertain an appeal from an award of attorneys' fees that "is independently final—which means, after the district judge ha[s] decided how much must be paid." *Id*. Here, the district judge has decided how much must be paid: $0. There is nothing left for the district court to do

regarding the award of attorneys' fees, making the award independently final. Therefore, we have pendent appellate jurisdiction to hear the defendants' cross-appeal regarding attorneys' fees. Now that we have explained our statutory basis for reviewing the district court's rulings on Count V and on attorneys' fees, we turn to a substantive review of the district court's ruling on Count V.

## III

Count V of Tradesmen's complaint seeks permanent injunctive relief against PLS, Black, Walker, Ellis, and Boyer, asking the court to compel them to comply with the obligations of their CNTCs by enjoining them from disclosing or using confidential information and trade secrets, enjoining them from soliciting Tradesmen customers, and enjoining them from competing with Tradesmen for eighteen additional months (since Tradesmen believes that the defendants did not comply with their CNTCs during the eighteen months after they left Tradesmen). Awards of permanent injunctive relief in diversity cases are governed by the forum state's choice-of-law rules. *Dunkin' Donuts, Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 775 (N.D. Ill. 2005). Consequently, before we can review the district court's refusal to grant this relief to Tradesmen, we must first clarify which state's law is controlling in this case. Three states appear to be viable candidates. Tradesmen is an Ohio corporation. Black, Walker, Ellis, and Boyer are Indiana residents who worked in Tradesmen's Indiana offices. PLS is an Illinois corporation, and Illinois is the forum state for this action.

Fortunately, the CNTCs contain a choice-of-law clause, designating that all CNTC disputes will be resolved under

Ohio law. Illinois, whose choice-of-law rules govern in this case, generally "respects a contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004). Since the parties do not dispute the CNTCs' formation, consideration, or conditions surrounding their signing, there do not appear to be any public policy concerns surrounding the CNTCs' choice-of-law provision. Therefore, we will analyze Tradesmen's permanent injunctive relief claims regarding the enforcement of the CNTCs under Ohio law.

The Ohio Supreme Court has declared that "the power to grant injunctive relief … should be exercised when essential to prevent irreparable harm to a contesting party." *Rankin-Thoman, Inc. v. Caldwell*, 329 N.E.2d 686, 441 (Ohio 1975). Moreover, "[i]t is well settled [under Ohio law] that an injunction will not issue where there is an adequate remedy at law." *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 768 N.E.2d 619, 630 (Ohio 2002). In order for a remedy at law to be adequate, it must be "of such a nature that full indemnity may be recovered without a multiplicity of suits" and be "as practical, and as efficient to the ends of justice and its prompt administration as the remedy in equity." *Id.* at 631-32 (quotations and citations omitted). The "adequacy of the putative legal remedy is also dependent upon whether 'damages might be reasonably estimated.'" *Id.* at 632 (quoting *Fuchs v. United Motor Stage Co., Inc.*, 21 N.E.2d 669, 675 (Ohio 1939)). Thus, if a plaintiff fails to demonstrate either irreparable harm or lack of an adequate legal remedy, the plaintiff's claim for injunctive relief fails.

Tradesmen emphasized at oral argument that "in these types of cases, it often is extremely difficult to pinpoint exact damages." For this reason, Tradesmen believes that it lacks an adequate remedy at law, making permanent injunctive appropriate here. Nevertheless, Tradesmen still has to demonstrate irreparable harm in order to gain injunctive relief. We believe that Tradesmen has failed to show harm at all—let alone irreparable harm. Therefore, Tradesmen's claim for permanent injunctive relief must fail.

We note at the outset that Tradesmen failed to seek preliminary injunctive relief against the defendants. Preliminary injunctions are an ideal remedy for plaintiffs whose damages are ongoing and difficult to pinpoint. Even though Tradesmen argues that its damages are ongoing and difficult to pinpoint, the company admitted at oral argument that it deliberately "chose not to" seek preliminary injunctive relief. That choice alone suggests that Tradesmen has not suffered irreparable harm. In fact, the Ohio Supreme Court made a similar finding in *Sternberg v. Board of Trustees of Kent State University*, 308 N.E.2d 457, 460 (Ohio 1974) (per curiam). The plaintiff in *Sternberg* brought an action to enjoin the termination of an experimental high school program at Kent State University. During the proceedings at the state trial court, the plaintiff never sought a temporary restraining order or a preliminary injunction against Kent State, and as a result, Kent State "implemented their plan to terminate the high school program and proceeded to dismantle and redistribute the existing facilities." *Id*. at 459. When the matter came before the Ohio Supreme Court two years later, the court denied the plaintiff

permanent injunctive relief against Kent State because the plaintiff

> made no attempt to preserve the status quo by application for temporary or preliminary injunctive relief. The high school program has been terminated and the facilities redistributed. To grant the relief sought would require a costly reversal of the process. Not only would this create a hardship upon appellees, but the public would be injuriously affected by the diversion of resources to a program which would be short lived and not necessary to the maintenance of the university.

*Id*. at 460. Like the defendants in *Sternberg*, the defendants here would suffer a "costly reversal of the process" of building their business, PLS, if we were to extend the terms of their CNTCs by eighteen additional months, as Tradesmen urges us to do. If Tradesmen wanted to extend the terms of the CNTCs, it should have moved for this relief earlier in the form of a preliminary injunction.

Indeed, Tradesmen's deliberate choice to seek an injunction later, rather than sooner, appears to be a strategic choice to inflict maximum harm on its new competitors. And while Tradesmen claimed at oral argument that Ohio law permits employers to "control competition" through the use of CNTCs, Tradesmen did not cite a single Ohio case to support this proposition other than *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975). What *Raimonde* actually held is the following:

> a covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests. A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such results.

*Id*. at 547. While *Raimonde* allows employers to implement protections against enterprising former employees, it only allows these protections up to the point that they do "not impose undue hardship on the employee[s]." The protections that Tradesmen asks this court to enforce would undoubtedly impose an undue hardship on the defendants, and as a result, are not enforceable under Ohio law.

Turning to the specifics of these protections, the CNTCs prohibit former employees from "ever" using or disclosing Tradesmen's "proprietary information." Arguably, defendants Boyer and Walker disclosed Tradesmen's proprietary information when they sent emails from their work accounts to their personal accounts with information about Tradesmen's workers' compensation rates, manager compensation rates, marketing materials, and potential customer reports purchased from Dun & Bradstreet. Tradesmen does not present any evidence, however, that suggests the defendants actually used this emailed information in establishing PLS. Tradesmen also

did very little—if anything—to keep the proprietary information that the defendants emailed themselves confidential. Moreover, Tradesmen admitted at oral argument that the proprietary information acquired by the defendants at Tradesmen and later used by the defendants in establishing PLS fell short of a trade secret.

The proprietary information used by the defendants in establishing PLS also fell short of goodwill. Although Tradesmen claims that PLS performed work for a few Tradesmen clients before the defendants' CNTCs had expired, Tradesmen does not dispute that these mutual clients were unknown to the defendants before they started PLS. Tradesmen also does not dispute the defendants' claim that they turned down business from their former clients at Tradesmen before their CNTCs had expired. Still, Tradesmen argues that the defendants violated the terms of their CNTCs by using "information about how [to] do business [and] how [to] approach customers" in establishing their new business. But Tradesmen cannot point to a single case in which an Ohio court has upheld a CNTC restricting this kind of proprietary information.

Like Tradesmen, we are unable to locate an Ohio case that upholds a CNTC protecting proprietary information that constitutes something less than either trade secrets or goodwill. But we do know from the Ohio case law that its courts will enforce CNTCs only to the extent that they are "reasonable." *Rogers v. Runfola & Assocs., Inc.*, 565 N.E.2d 540, 543 (Ohio 1991). In determining whether a CNTC is reasonable, Ohio courts consider the following factors:

> the absence or presence of limitations as to time and space; …[w]hether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Raimonde*, 325 N.E.2d at 547 (quoting *Extine v. Williamson Midwest, Inc.*, 200 N.E.2d 297, 299 (Ohio 1964)).

Considering these factors, we believe that the proprietary information that Tradesmen seeks to protect is unreasonable. The only training that Tradesmen provided the defendants on how to do business and how to approach customers consisted of a "five-day general sales presentation on how to sell." In addition, most of the documents that the defendants emailed themselves were publicly available. Even the Dun & Bradstreet reports—the only emailed proprietary information that Tradesmen had purchased—were subject to virtually no confidentiality protections at Tradesmen. This proprietary

information is not the kind that would provide an "unfair" advantage to the defendants; rather, it seems much closer to general know-how. As a result, Tradesmen's attempt to prohibit the defendants from using this proprietary information at PLS appears to be nothing but "merely seek[ing] to eliminate ordinary competition." *Raimonde*, 325 N.E.2d at 547.

Even if the proprietary information terms of the CNTCs were reasonable under Ohio law, the geographic restrictions imposed by the CNTCs are not. Ohio law unequivocally requires that CNTCs "contain reasonable geographical and temporal restrictions." *Lake Land Emp. Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 30 (Ohio 2004). If a CNTC contains unreasonable restrictions, the Ohio courts will not enforce these restrictions (although Ohio courts may re-write the restrictions to make them reasonable or enforce them only to the extent they are reasonable). *Raimonde*, 325 N.E.2d at 546-47. Here, Tradesmen asks us to enforce restrictions that effectively prohibit the defendants from working anywhere in the United States. The CNTC prohibits the defendants from working within one-hundred miles of *any Tradesmen field office*—not just the field offices for which the defendants worked—even though Tradesmen has field offices *in every state of the United States*. Remarkably, the defendants appear to have complied with the one-hundred mile restriction since the initial PLS office was in Mahomet, Illinois, and Mahomet, Illinois is at least one-hundred miles from Lafayette, Indiana, where Tradesmen has its nearest field office. *Google Maps*, http://www.maps.google.com (last visited July 10, 2013).

As if this one-hundred mile geographic term were not restrictive enough, the CNTC contains an additional geographic term that prohibits the defendants from working within twenty-five miles "of any location at or to which the Company is providing its services." If we were to enforce this geographic term as written, the defendants would have never been able to comply with it as long as they performed work anywhere in the United States. Both Tradesmen and PLS supply skilled labor to their customers in one of two ways: by sending laborers to work for the customer on-site, or by sending labor to work for the customer's customer on-site. By prohibiting the defendants from working in locations containing both Tradesmen's customers and Tradesmen's customer's customers, this restriction effectively prohibits the defendants from working anywhere within the United States. Here, the defendants already moved to another state to start their own business, but that was not good enough for Tradesmen. Apparently, Tradesmen wanted the defendants to move to another country.

We are not aware of any Ohio case upholding such a geographic restriction in a CNTC, and in fact, we are aware of two Ohio cases that limit overbroad geographic restrictions in a CNTC. *See Rogers*, 565 N.E.2d at 544 (modifying a county-wide restriction in a CNTC down to a city-wide restriction); *Century Bus. Servs., Inc. v. Urban*, 900 N.E.2d 1048, 1056 (Ohio Ct. App. 2008) (modifying a restriction prohibiting competition in any county where the employer did business to one prohibiting competition in any county where the employer's customers were located).

In sum, the defendants' CNTCs contain both unreasonable proprietary information terms and unreasonable geographic terms. Nevertheless, the defendants appear to have complied with almost all of the terms of their CNTCs during the eighteen months after they left Tradesmen, and they certainly complied with all of the *reasonable* terms of their CNTCs. As a result, we find no evidence of any harm to Tradesmen by the defendants' actions, and we certainly find no evidence of the irreparable harm required for injunctive relief. The district court correctly denied permanent injunctive relief to Tradesmen.

**IV**

Turning now to the cross-appeal, the defendants sought attorneys' fees in the district court under ITSA after the district court granted summary judgment to the defendants and denied Tradesmen permanent injunctive relief. In support of their attorneys' fees' claim, the defendants argued that

> [t]he result of this long litigation odyssey was predictable. From the beginning, it was plainly apparent Tradesmen never suffered any harm from the establishment of the Defendants' start-up business in Central Illinois where Tradesmen has no presence at all. Further, Tradesmen knew then, and knows now, that the Defendants never used any alleged trade secrets to compete with it because the Defendants never solicited or serviced Tradesmen's customers. Still, Tradesmen pressed on and forced its much-smaller counterpart to spend a large amount of legal fees on the claim asserted in the Complaint. The Court

> should find that Tradesmen maintained its trade
> secrets misappropriation claim in bad faith.

Without any Illinois case law for guidance, the district court was forced to interpret the language in 765 Ill. Comp. Stat. 1065/5, which allows a prevailing party to collect attorneys' fees if "a claim of misappropriation is made in bad faith." The district court concluded that the defendants had "not adequately supported the proposition that the statute authorizes attorney's fees when a suit is maintained in bad faith," instead concluding that a suit could only be "made in bad faith" if it "was initiated in bad faith." Because the district court found that Tradesmen had not initiated the suit in bad faith in light of the emails the defendants sent themselves before leaving Tradesmen, the district court denied the defendants' motion for attorneys' fees. The defendants now appeal the district court's interpretation of 765 Ill. Comp. Stat. 1065/5, claiming that the statute allows a prevailing party to collect attorneys' fees when a suit is either initiated in bad faith or maintained in bad faith.

As both parties point out in their briefs, there is no Illinois case law on how "made" should be interpreted in this section of ITSA. Consequently, both parties cite California decisions that interpret the "made in bad faith" language (since it is the same language used in the widely adopted Uniform Trade Secrets Act) to support their positions. After reviewing the California cases, including *SASCO v. Rosendin Elec., Inc.*, 143 Cal. Rptr. 3d 828, 835 (Ct. App. 2012) (requiring "bad faith in bringing or maintaining the claim") and *JLM Formation, Inc. v. FORM+PAC*, No. C 04-1774 CW, 2004 WL 1858132, at *1 (N.D. Cal. Aug. 19, 2004) (interpreting made as "bringing and

maintaining"), we conclude that "made in bad faith" is correctly interpreted as either bringing or maintaining a suit in bad faith. In addition to the California case law, common sense supports such an interpretation. Regardless of her intentions at the time of filing, surely a plaintiff makes a claim in bad faith if she continues to pursue a lawsuit—even after it becomes clear that she has no chance to win the lawsuit—in order to cause harm to the defendant.

Consequently, we find that the district court erred in determining that a claim "made in bad faith" must be "initiated in bad faith." A claim is made in bad faith when it is initiated in bad faith, maintained in bad faith, or both. Because the district court incorrectly interpreted 765 Ill. Comp. Stat. 1065/5, we reverse the district court's denial of attorneys' fees to the defendants, and we remand this issue back to the district court. The district court already determined that Tradesmen did not initiate its claim against the defendants in bad faith; it now needs to determine whether Tradesmen has maintained its claim against the defendants in bad faith.

## V

For the foregoing reasons, we AFFIRM the district court's denial of permanent injunctive relief to Tradesmen. We REVERSE the district court's denial of attorneys' fees to the defendants, and we REMAND the issue back to the district court for reconsideration of the defendants' motion in light of this opinion.

HAMILTON, *Circuit Judge*, concurring. I join the court's opinion in full. I write separately to emphasize both the importance of the choice-of-law issues in covenant-not-to-compete litigation and the under-appreciated consequences of courts' willingness in many states to rewrite unreasonable covenants so as to enforce a reasonable but fictional covenant, one that the parties might have made but did not actually make.

At a superficial level, many states adopt the same broad principles in deciding whether and how to enforce an employee's covenant not to compete with a prior employer. Such contracts are considered to be in restraint of trade but will be enforced if they are reasonable in scope and protect a former employer's legitimate interests. See generally Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy*, 13 U. Penn. J. Bus. L. 751, 754 (2011) ("most states will moderately enforce noncompetes using the standard reasonableness test"). But even a gentle tap on that fragile surface of similarity shows important differences from state to state. See generally Brian M. Malsberger, et al., Covenants Not to Compete: A State-by-State Survey (8th ed. 2012); Viva R. Moffat, *Making Non-Competes Unenforceable*, 54 Ariz. L. Rev. 939, 943–52 (2012) (summarizing major variations among states); Gillian Lester & Elizabeth Ryan, *Choice of Law and Employee Restrictive Covenants: An American Perspective*, 31 Comp. Lab. L. & Pol'y J. 389, 392 (2010) ("states vary widely in their friendliness to employee non-compete agreements"); Cynthia L. Estlund, *Between Rights and Contract: Arbitration Agreements and Non-Compete Covenants as a Hybrid Form of*

*Employment Law*, 155 U. Penn. L. Rev. 379, 391–96 (2006) (summarizing variations among states). For a convenient and detailed treatment of the subject state-by-state, see the Malsberger book cited above.

These wide variations mean that in cases that go to court, a court's choice of law will often be decisive. See, *e.g.*, *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 947–48 (7th Cir. 1994) (affirming denial of preliminary injunction; refusing to honor covenant's selection of governing state law where chosen state had minimal connection to parties' relationship). The variations also mean that when parties are considering whether to sue, uncertainty about choice of law will be a powerful factor in calculating risks and benefits of litigation, and the eventual choice of forum may well prove to be critical. See David A. Linehan, *Due Process Denied: The Forgotten Constitutional Limits on Choice of Law in the Enforcement of Employee Covenants Not to Compete*, 2012 Utah L. Rev. 209, 210–11 (2012).

The parties in this case have proceeded on the basis that Ohio law, chosen in the covenants drafted by the Ohio-based employer, controls the covenants. In light of our court's decision in *Curtis 1000*, that was a reasonable choice, for in that case we disagreed with a district court's conclusion that Illinois courts would refuse to enforce a covenant that was enforceable under another state's law chosen in the covenant itself, but repugnant to the public policy of Illinois. See 24 F.3d at 948 (disagreeing with *Curtis 1000, Inc. v. Suess*, 843 F. Supp. 441, 446 (C.D. Ill. 1994), on this point, but affirming denial of injunction on other grounds); see also *Vencor, Inc. v. Webb*, 33 F.3d 840, 844–45 (7th Cir. 1994) (affirming denial of injunc-

tion but applying Illinois choice-of-law principles to apply covenant's choice of Kentucky law). The extent to which state courts would refuse to enforce covenants not to compete on the basis of their own public policy remains a matter of state law, however. We should not discount too quickly the force of that public policy, which gives state courts considerable latitude.

This question is especially pointed where, as in this case, an employer has drafted a broad and unenforceable covenant, but then seeks to take a more moderate position in court, asking a court to enforce the broad covenant only to a "reasonable" extent. The potential for misuse of this approach has long been recognized. See Harlan M. Blake, *Employee Covenants Not to Compete*, 73 Harv. L. Rev. 625, 682–84 (1960). The basic problem is that if courts are willing to rewrite overly broad covenants for the sake of being reasonable, employers have a powerful incentive to draft oppressive, overly broad covenants. In the many cases that will never get to court, or where employees will be deterred even from trying to leave, the employer benefits from the *in terrorem* effects of the oppressive and overly broad covenants. Then, in the few cases that go to court, the employer can retreat to a reasonable position without suffering any penalty or disadvantage for its oppressive drafting. This potential abuse may well persuade state courts to refuse to honor parties' contractual choices of other states' laws, particularly where the forum state's public policy is to protect employees from overly broad covenants.

In the Seventh Circuit, for example, Wisconsin has a statute that prohibits enforcement of unreasonable covenants "even as to any part of the covenant or performance that would be a reasonable restraint." Wis. Stat. § 103.465. On the basis of that

statute, Wisconsin courts refuse to honor contractual choices of law that would evade it. See *Beilfuss v. Huffy Corp.*, 685 N.W.2d 373, 377 (Wis. App. 2004) (reversing injunction by relying on Wisconsin public policy to refuse to apply Ohio law, which would allow judicial modification of unreasonable covenant and enforcement to reasonable extent); *General Medical Corp. v. Kobs*, 507 N.W.2d 381 (Wis. App. 1993) (relying on Wisconsin public policy to refuse to apply Virginia law, which would allow judicial modification of unreasonable covenant).

Indiana is not quite as strict as Wisconsin about rewriting overbroad covenants, but it enforces a fairly narrow version of the "blue-pencil" doctrine. That doctrine allows a court to strike out specific provisions that are overly broad where the covenant is clearly divisible, but not to add language that might be used to make a covenant enforceable. See *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 687 (Ind. 2005) (stating general rule and holding that overly broad employment covenant barring competition in entire United States could not be edited to impose reasonable limit); *Licocci v. Cardinal Associates, Inc.*, 445 N.E.2d 556, 562 (Ind. 1983) (applying doctrine to enforce severable covenants); *Donahue v. Permacel Tape Corp.*, 127 N.E.2d 235, 241 (Ind. 1955) (reversing injunction where geographic limits of covenant were not severable); see generally *JAK Productions, Inc. v. Wiza*, 986 F.2d 1080, 1087 (7th Cir. 1993) (applying Indiana blue-pencil doctrine). One district court has predicted that Indiana courts would invoke that public policy to reject a covenant's choice of another state's law that would have allowed an employer to enforce an unreasonable covenant to only a reasonable extent. *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 815–20 & n.5 (S.D. Ind. 2007);

cf. *Zimmer, Inc. v. Sharpe*, 651 F. Supp. 2d 840, 851–52 (N.D. Ind. 2009) (applying Indiana law as not contrary to Louisiana public policy on covenants not to compete).

Illinois law reflects a fairly strong reluctance to salvage unreasonable covenants by judicial modification, though the case law seems to allow a fair amount of room for equitable judgment that can make it difficult for parties to foresee potential modifications in litigation. In *House of Vision, Inc. v. Hiyane*, 225 N.E.2d 21, 25 (Ill. 1967), the Illinois Supreme Court reversed an injunction issued after a trial court had modified an overly broad covenant, explaining: "To stake out unrealistic boundaries in time and space, as the employer did in this case, is to impose upon an employee the risk of proceeding at his peril, or the burden of expensive litigation to ascertain the scope of his obligation. While we do not hold that a court of equity may never modify the restraints embodied in a contract of this type and enforce them as modified, the fairness of the restraint initially imposed is a relevant consideration to a court of equity." Accord, *e.g.*, *Pactiv Corp. v. Menasha Corp.*, 261 F. Supp. 2d 1009, 1015–17 (N.D. Ill. 2003) (summarizing Illinois law and declining to modify overly broad covenant); *Eichmann v. National Hosp. & Health Care Svcs.*, 719 N.E.2d 1141, 1149 (Ill. App. 1999) (declining to modify overly broad covenant). Thus far, however, we have predicted that Illinois courts would be more willing than courts in Wisconsin or Indiana to allow avoidance of these doctrines of Illinois law through a choice-of-law clause, at least if the choice has a reasonable connection to the contract. See *Curtis 1000*, 24 F.3d at 948. Whether the Illinois courts will ultimately agree with that prediction remains to be seen. Cf. *Cambridge Engineering, Inc. v.*

*Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 529–30 (Ill. App. 2007) (stating that "allowing extensive judicial reformation of blatantly unreasonable posttermination restrictive covenants may be against public policy," but deciding case on other grounds).