NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 30, 2017[*]
Decided August 31, 2017

**Before**

DIANE P. WOOD, *Chief Judge*

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

No. 16-2502

| | |
|---|---|
| CHRISTOPHER PYLES, | Appeal from the United States |
|     *Plaintiff-Appellant,* | District Court for the Southern District of Illinois. |
| *v.* | |
| | No. 13-299-SCW |
| WILLIAM SPILLER, *et al.,* | |
|     *Defendants-Appellees.* | Stephen C. Williams, *Magistrate Judge.* |

**O R D E R**

Christopher Pyles, an Illinois inmate in Menard Correctional Center (a maximum security prison), has sued prison officials under 42 U.S.C. § 1983 for violating the Eighth Amendment. He contends that, through unjustified lockdowns and double-celling of inmates, the defendants damaged his mental health. A magistrate

_____

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. *See* FED. R. APP. P. 34(a)(2)(C).

judge, presiding by consent, *see* 28 U.S.C. § 636(c)(1), granted summary judgment for the defendants. The judge concluded that Pyles presented insufficient evidence that the defendants are aware that conditions at Menard pose a substantial risk of harm to him. We agree with the judge's reasoning and affirm the judgment.

In reviewing the grant of summary judgment against Pyles, we recite the facts in the light most favorable to him. *See Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1009 (7th Cir. 2013). Between 2011 and 2013, lockdowns restricted Pyles's movements for 490 days, about 45% of the time. The reason cited by the prison for most of these lockdowns was inmate violence. The violence included inmates assaulting staff members (for example, from April to May 2012 Pyles's section was on lockdown for 44 consecutive days because an inmate had assaulted a correctional officer). Lockdowns also followed inmate-on-inmate violence (such as in February 2012 when the entire prison was placed on one form of lockdown for 11 days, after which Pyles's unit was moved to a less restrictive lockdown for three days and ultimately back to normal operations). Other reasons for lockdowns included inclement weather (for example, a three-day lockdown for the entire facility in February 2011) and "tactical operations" (for example, a one-day lockdown for the entire facility in November 2013). The longest continuous lockdown affecting Pyles lasted about 70 days from February to April 2013 after a group of inmates attacked two correctional officers in the chapel. Some of the prison logs documenting staff activity during the lockdowns reflect that prison staff systematically searched the facility for weapons and other contraband. The logs also show that the lockdown restrictions were often lifted incrementally, suggesting that officials tailored lockdowns to the prison's needs. Pyles contends that many lockdowns had no legitimate purpose—they occurred, he believes, to accommodate staff vacations. But he has no evidence to back up his contention.

Pyles asserts that the lockdowns affected him in three ways. First, they limited his access to treatment for his mental health. Pyles is diagnosed with bipolar disorder and is assigned to both a prison psychologist and psychiatrist. (The psychologist believes that he also exhibits characteristics of obsessive-compulsive disorder.) The lockdowns have limited his interaction with these professionals. Visits with the psychologist, scheduled for up to one hour about every four to six weeks, were usually canceled during lockdowns. At those times, when mental health workers could examine only those inmates facing an emergency, Pyles's psychologist might just walk by her patients' cells for a "visual check" to ensure that no one is in crisis. The psychiatrist's visits were also limited. He is scheduled to see each patient for up to 10 minutes every six to eight weeks. But during lockdowns he too would only walk by inmates' cells to

ensure that every inmate received proper medication. Neither doctor opines that the lockdowns harm Pyles's mental health. His psychiatrist says that "you can not pinpoint" the specific cause of an episode of depression that an inmate experiences tomorrow to "today [when he] got locked down." The psychologist attributes any adverse mental-health effects to the changes in his medication for bipolar disorder, not the lockdowns.

The second consequence of the lockdowns, according to Pyles, is the restriction on his ability to exercise. Since June 2013 Pyles has shared a small cell with another inmate. Although the cell has enough space for one inmate to do sit-ups or push-ups on the floor (or on the bed if the other cellmate allows the practice), there is not enough room for cardio exercise. Pyles's psychologist has taught inmates facing life in prison yoga poses that they can do in a small space to try to address their concerns about limited cell space.

The third effect of the lockdowns is the prolonged time that Pyles has to spend in his cell with a cellmate. Pyles observes that a prison psychologist, now deceased, recorded in Pyles's medical record in July 2012 that he needed a single cell because of "mental health concerns." Neither of Pyles's current mental-health professionals, however, question his compatibility with a double-occupancy cell today.

After Pyles complained internally to the prison staff, to no avail, that the lockdowns and overcrowding needlessly exacerbated his mental-health symptoms, this lawsuit followed. The magistrate judge recruited counsel for Pyles, but he later granted summary judgment for the defendants on the Eighth Amendment claim. The judge explained that the record did not permit a finding "that the length and timing of those lockdowns were not penologically justified." It added that Pyles's prison grievances were not sufficient to show that the defendants knew about the harm he alleged.

On appeal Pyles maintains that Menard officials used lockdowns needlessly in an already overcrowded prison and thereby worsened his medical condition in violation of the Eighth Amendment. In his reply brief Pyles dropped his damages claim; he now pursues only injunctive relief. To get past summary judgment on his Eighth Amendment claim, Pyles must submit triable evidence that he suffered objectively serious harm and that the defendants knew about a substantial risk of that harm yet recklessly ignored it. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016). He has not done so.

To begin, Pyles has presented no evidence that prison officials locked down Menard in reckless disregard of a known risk of substantial harm to his mental health. We will assume that Pyles's mental-health condition was serious and that the lockdowns worsened his mental state. Although Pyles presents no evidence to support his assertion that lockdowns were not penologically justified, we will further assume that some were not. The problem for Pyles is that he presents no evidence that any defendant had or has reason to believe that the lockdowns harm him mentally. At most the record suggests that his psychiatrist does not know if the lockdowns harm Pyles, but his psychologist opines that they have not. Prison officials may rely on the judgment of the medical professionals regarding Pyles's mental health. *See McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). Because neither medical professional believes that the lockdowns were harming Pyles's mental health, the officials conducting the lockdowns likewise had no reason to believe that lockdowns harm him. Thus they were not deliberately indifferent to his mental-health needs. *McGee*, 721 F.3d at 483; *Arnett*, 658 F.3d at 755.

Pyles's argument that the lockdowns unconstitutionally harmed his mental health by restricting his ability to exercise is also unavailing. A deprivation of exercise that prison officials expect will likely result in severe health problems may violate the Eighth Amendment, unless the deprivation is proportionate to a legitimate penological purpose. *See Turley v. Rednour*, 729 F.3d 645, 652 (7th Cir. 2013); *Delaney v. DeTella*, 256 F.3d 679, 683–84 (7th Cir. 2001). But Pyles again failed to present evidence to support his contention. He presented no evidence that any reduction in exercise during lockdowns adversely affected his mental health. He also adduced no evidence that any defendant was aware that lockdown-related reductions in exercise would likely impair Pyles's mental health. On this record, then, the defendants did not violate the Eighth Amendment by virtue of the effect of lockdowns on Pyles's ability to exercise.

That brings us to Pyles's frustration with double-celling inmates at Menard. The Supreme Court has held that double-celling is not per se a constitutional violation. *Rhodes v. Chapman*, 452 U.S. 337, 347–50 (1981); *see also French v. Owens*, 777 F.2d 1250, 1252 (7th Cir. 1985). Pyles responds that double-celling for *him* is a problem. He relies on the dated record from the deceased psychologist who opined in 2012 that at that time Pyles should have a single cell because of unspecified "mental health concerns." This is insufficient evidence for an injunction today. Aside from the hearsay problem, to obtain an injunction against double-celling, Pyles must furnish present-day evidence. But Pyles's current mental-health professionals do not question his suitability for his

living in a double-occupancy cell today. Thus in double-celling Pyles, no defendant is recklessly ignoring a current, substantial risk to Pyles's mental health.

AFFIRMED.